**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

No. 17-60038

United States Court of Appeals
Fifth Circuit

**FILED**

October 16, 2017

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

   Plaintiff - Appellee

v.

SHERRIE BOX BENNETT,

   Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Mississippi

Before HIGGINBOTHAM, SMITH, and HAYNES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Sherrie Bennett was convicted of one count of conspiracy to distribute a controlled substance, ten counts of distributing or dispensing a controlled substance, and three counts of bankruptcy fraud. Ms. Bennett appeals, urging error by the district court and the prosecutor. Finding no reversible error, we affirm.

I.

At all times relevant here, Defendant Sherrie Box Bennett worked as a registered nurse at Biloxi Radiation Oncology Center (the "Clinic") for Dr. Laurence Lines. Dr. Laurence Lines began to suffer from symptoms of

No. 17-60038

dementia, becoming increasingly reliant on Ms. Bennett.[1] Ms. Bennett helped him buy a home next door to her home, was a named beneficiary of Dr. Lines' will, and held his medical power of attorney.

The Government presented evidence that, from at least 2010, prescriptions for controlled medications in Dr. Lines' name were written for Ms. Bennett, her husband and co-defendant Jerry Dean Bennett, and other members of her family. The Clinic's medical records did not reflect that the recipients were patients. At trial, the Government introduced evidence that Ms. Bennett effectively wrote these prescriptions using Dr. Lines' DEA number and tracing a signature stamp embossed with Dr. Lines' signature.[2]

In 2011, the Clinic filed for protection under Chapter 11, initially remaining a debtor-in-possession before the United States Trustee moved to have a Chapter 11 trustee appointed.[3] Prior to the trustee's appointment, Ms. Bennett remained in control of the Clinic's checkbook. An appointed accountant noticed three suspicious checks that formed the basis for the counts of bankruptcy fraud against Ms. Bennett: (1) Check #1372, dated 1/25/13, for $16,636; (2) Check #1422, dated 3/22/13, for $10,000; and (3) Check #1445, dated 4/3/13, for $28,000. Evidence was presented at trial that Ms. Bennett had written and cashed those checks and deposited similar amounts into her own checking account.[4] Attorney Kimberly R. Lentz was appointed as the

---

[1] In 2013, Dr. Steven Fineburg, who had been treating Dr. Lines since 2011, documented the following: "Since I have been taking care of him for probably a year and a half I would think his primary issues are his Alzheimer's disease, his hypertension, and hyperthyroidism. In my opinion, from the evaluations and the visits, it's been difficult for him to make any decisions, even about his general well-being and his health."

[2] Ms. Bennett testified that she had only called in prescriptions at Dr. Lines' request and that she had not used the signature stamp.

[3] *See In re Bioloxi Radiation Oncology Center, LLC*, No. 11-52727-KMS, (Bankr. S.D. Miss. Nov. 22, 2011).

[4] Ms. Bennett testified that the checks were to refund monies Dr. Lines had loaned to the Clinic and that her own cash deposits around the same time were proceeds from the sale of Mary Kay cosmetics and the sale of other personal assets.

No. 17-60038

Chapter 11 Trustee, and on June 17, 2013, Lentz filed an adversary proceeding against Ms. Bennett, alleging gross mismanagement of the bankruptcy estate and fraudulent appropriation of debtor assets.

Separately, the Mississippi Department of Human Services was contacted about Dr. Lines. Jamie Thompson, then supervisor of a unit "that deals with the investigation of abuse, neglect, and financial exploitation of vulnerable persons," was dispatched to Dr. Lines' home, where he found the doctor living in squalor. Thompson additionally testified that, on another occasion, "we went by there actually to try to interview the Bennetts in their home, and Mr. Bennett . . . was actually the one who said, you know, 'We have nothing to say,' and slammed the door in our face, so that was the end of our conversations with them. He informed us that he did have an attorney, and so we respected his right to counsel."

Ultimately, a federal grand jury returned an 11-count indictment against the Bennetts, and then a first superseding indictment, charging both of the Bennetts with one count of conspiracy to distribute and dispense a controlled substance as prohibited by 21 U.S.C. § 841(a)(1), all in violation of 21 U.S.C. § 846; ten counts of knowingly and intentionally distributing and dispensing a controlled substance outside of professional practice in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and charging Ms. Bennett alone with three counts of bankruptcy fraud in violation of 18 U.S.C. § 153.

The jury trial began on July 19, 2016 and concluded ten days later. After the Government rested its case-in-chief, the Bennetts moved for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure, which the district court denied for Ms. Bennett and granted in part and denied in part for Mr. Bennett. The jury returned a verdict of guilty on all charges against Ms. Bennett. The court sentenced Ms. Bennett to: (1) concurrent terms of: (a)

3

No. 17-60038

78 months of imprisonment for the distribution of schedule II and schedule III narcotics; (b) 60 months imprisonment for distribution of schedule IV narcotics; and (c) 60 months for bankruptcy embezzlement; (2) a three-year term of supervised release for each charge to run concurrently; (3) an $8,000 fine; (4) a $1,400 special assessment; and (5) $54,636 in restitution.

Ms. Bennett filed a post-trial Motion for Judgment of Acquittal or Alternatively, Motion for a New Trial, which the district court denied. Ms. Bennett appeals that denial, inter alia, raising the following challenges: (1) The court failed to give her proposed jury instructions; (2) The court failed to declare a mistrial following alleged prejudicial testimony; (3) The court failed to declare a mistrial following alleged prosecutorial misconduct; (4) The court erroneously allowed the prosecution to amend its indictment; and (5) the evidence presented was insufficient to sustain her conviction.[5]

## II.

We begin with Ms. Bennett's claim that the district court erred when it rejected two of her proposed jury instructions. This Court reviews the propriety of jury instructions for abuse of discretion, asking "whether the charge, as a whole, is a correct statement of law."[6] "Where, as here, the defense requested a jury instruction and the request was denied, we review the denial for abuse of discretion. . . . [We] afford[] 'substantial latitude to the district court in describing the law to the jury.'"[7] "A district court abuses its discretion by failing to issue a defendant's requested instruction if the instruction '(1) is substantively correct; (2) is not substantially covered in the charge given to the

---

[5] Ms. Bennett filed a motion to expedite this appeal on April 25, 2017, which this Court granted. Docket No. 41-42. The docket also reflects that the appeal of co-defendant Mr. Bennett was partially dismissed for failure to order the transcript and that he is currently in the process of reopening the case. Mr. Bennett is not a party to this appeal. Docket No. 69.

[6] *United States v. Sanjar*, 853 F.3d 190, 205 (5th Cir. 2017).

[7] *United States v. Bowen*, 818 F.3d 179, 188 (5th Cir. 2016) (citation omitted) (quoting *United States v. Barnes*, 803 F.3d 209, 222 (5th Cir. 2015)).

4

jury; and (3) concerns an important point in the trial so that the failure to give it seriously impairs the defendant's ability to present effectively a particular defense.'"[8]

Ms. Bennett argues that the district court erroneously rejected her proposed instructions, thereby enabling the Government to prosecute for failure to adhere to medical regulations, rather than the crimes charged. For instance, Ms. Bennett points to the Government's closing argument in which the prosecutor argued that the evidence showed that no physical exam had been performed nor had a medical file been maintained; that these regulatory violations sufficiently constituted distribution of a controlled substance outside the usual course of professional practice. While this Court has held that regulations can be used to help clarify the law, Ms. Bennett argues, the use of regulations here went beyond that.[9]

Ms. Bennett claims that her proposed jury instructions would have explained the difference between a violation of regulations and a criminal violation. The first proposed instruction read:

> During the trial, you have received evidence regarding certain regulations, rules, and guidelines. Even though the use of a rubber stamp in lieu of a physician's signature and/or the failure to keep a medical chart when prescribing certain controlled substances and/or telephonically calling in a schedule II controlled substance to a pharmacy may be inappropriate or a violation of the rules, such an act is not done in violation of the offense unless it was done corruptly or if it was intended at the time it is done with the

---

[8] *United States v. Sheridan*, 838 F.3d 671, 672–73 (5th Cir. 2016) (quoting *United States v. Simkanin*, 420 F.3d 397, 410 (5th Cir. 2005)); *accord United States v. Lucas*, 516 F.3d 316, 324 (5th Cir. 2008).

[9] Additionally, Ms. Bennett states, in a footnote, that this same reasoning applies to the bankruptcy conviction, but does not go beyond that conclusory assertion to explain how the Government attempted to prove bankruptcy fraud through failure to adhere to regulations. Thus, this argument, or the lack thereof, is waived due to inadequate briefing. *See United States v. Martinez*, 263 F.3d 436, 438 (5th Cir. 2001).

specific intent to violate the elements of the crime charges as set forth in these jury instructions.

Furthermore, if the defendant has a good faith belief that she/he was acting in accordance with the proper rules, regulations and guidelines, then that good faith belief is a defense to the crime charged.

The second instruction, lifted directly from a pair of judiciary bribery trials that Ms. Bennett's counsel had participated in, read:

Even though giving a judge something of value may be inappropriate or a violation of the ethical rules, such an act is not done corruptly so as to constitute a bribery offense unless it is intended at the time it is given to affect a specific action the judge officially will take in a case before him, or may take in a case that may be brought before him.

A gift or favor bestowed on a judge solely out of friendship, to promote good will, or for motive wholly unrelated to influence over official action does not violate the bribery statutes.

The district court, in rejecting the first proposed instruction, held that acting "corruptly" was not an element of any of the charges and giving this instruction would have served to confuse and mislead the jury. Additionally, the court noted that it had already included an instruction on good faith. As to the second proposed instruction, the court held that there was no legal or evidentiary basis to give the instruction from the bribery cases—the instruction was plainly not relevant.

On appeal, the Government adds that it was required to prove: (1) that the defendant distributed a controlled substance; (2) that she did so knowingly and intentionally; and (3) that she did so other than for a legitimate medical purpose and in the usual course of professional practice. Given those elements, the Government's argument goes, the jury was entitled to take into account

accepted medical standards in determining whether a prescription was distributed outside of professional practice.[10]

Assuming that Ms. Bennett preserved this issue for appeal, the district court did not abuse its discretion in omitting her proposed instructions. Section 841(a) states:

> Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
>
> (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or
>
> (2) to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance.[11]

The statute does not require a defendant to have acted "corruptly." Therefore, the first proposed instruction is not substantively correct.[12] Ms. Bennett's second proposed instruction fares no better; that is, even if the instruction is a substantively correct statement of the law regarding bribery, it is plainly not relevant.[13]

The heart of Ms. Bennett's argument, however, is that the court, in rejecting her proposed instructions, sanctioned a conviction based on Ms. Bennett's failure to adhere to medical regulations, rather than the elements of

---

[10] *See United States v. Norris*, 780 F.2d 1207, 1209 (5th Cir. 1986) (affirming district court's instruction to jury to consider "from an objective standpoint whether the drugs were dispensed in the usual course of professional practice").

[11] 21 U.S.C. § 841(a).

[12] Additionally, Ms. Bennett's proposed instruction would have been partially duplicative as the court had already included an instruction on good faith.

[13] Ms. Bennett argues that the bribery instruction "was intended to [show how] another district judge drafted a limiting instruction in a similar situation." We need not entertain this argument because we conclude that the Government's reference to medical regulations was appropriate.

the crimes charged. A close examination of the cases that Ms. Bennett relies on—*United States v. Brown* and *United States v. Christo*—proves otherwise.[14]

In *Brown*, we affirmed all but two counts of the convictions of pharmacists who engaged in a drug distribution conspiracy.[15] One pharmacist, like Ms. Bennett, argued that the "government worked a Due Process violation by transforming a violation of the regulations and guidelines of the [*Texas Pharmacy Laws and Regulations*] into a criminal offense."[16] We disagreed, finding that the government "both charged and proved a violation of the appropriate criminal statutes, not merely the related regulations" and thus drew a proper contrast between the "irreproachable, commonplace use of duly issued regulations in clarifying the scope and contour of criminal laws [and] the inappropriate replacement of criminal laws with civil regulations."[17]

By contrast, in *Christo*, the defendant was charged with the criminal misapplication of bank funds, but the government's theory was centered upon violation of 21 U.S.C. § 375a, a civil regulatory banking statute that prohibited the extension of credit in excess of $5,000 to bank officers.[18] There, we found that the "government's evidence and argument concerning violations of 21 U.S.C. § 375a impermissibly infected the very purpose for which the trial was being conducted."[19] Because we were left "question[ing] whether [appellant]

---

[14] *United States v. Brown*, 553 F.3d 768, 790–91 (5th Cir. 2008) (rejecting an argument that admission of the *Texas Pharmacy Laws and Regulations* ("TPLR") replaced criminal law with regulations and guidelines and concluding that the TPLR was probative of defendant's state of mind); *United States v. Christo*, 614 F.2d 486, 490–92 (5th Cir. 1980) (reversing and remanding where the jury instructions focused the jury on the intent element for a civil regulatory violation rather than the intent standard of the felony charged).

[15] *Brown*, 553 F.3d at 801.

[16] *Id.* at 790.

[17] *Id.* at 791 & n.71.

[18] 614 F.2d at 489.

[19] *Id.* at 492.

No. 17-60038

was found guilty of willful misapplication with intent to injure and defraud the bank or . . . for overdrafting his checking account," we reversed.[20]

Our case is more akin to *Brown*. As noted above, the Government was required to prove: (1) that Ms. Bennett distributed a controlled substance; (2) that she did so knowingly and intentionally; and (3) that she did so other than for a legitimate medical purpose and in the usual course of professional practice.[21] In *United States v. Armstrong*, we explained that the "third element is not expressly required . . . but relevant regulations provide that a controlled substance can be dispensed by a prescription 'issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.'"[22] "The logical converse is that a practitioner is unauthorized to dispense a controlled substance if the prescription *either* lacks a legitimate purpose *or* is outside the usual course of professional practice."[23] Stated differently, "knowingly distributing prescriptions outside the course of professional practice is a *sufficient condition* to convict a defendant under the criminal statutes relating to controlled substances."[24] The medical regulations therefore helped clarify the scope and contour of "outside the course of professional practice"—the very purpose for which the trial was being conducted—and thus did not work a due process violation against Ms. Bennett.[25]

---

[20] *Id.*

[21] *See Brown*, 553 F.3d at 781; *see also United States v. Armstrong*, 550 F.3d 382, 397 (5th Cir. 2008), *overruled on other grounds by United States v. Balleza*, 613 F.3d 432, 433 n. 1 (5th Cir. 2010).

[22] *Armstrong*, 550 F.3d at 397.

[23] *Id.*

[24] *Id.*

[25] *See Brown*, 553 F.3d at 790–92; *See also Norris*, 780 F.2d at 1209; *United States v. Ogle*, 201 F. App'x 979, 980 (5th Cir. 2006) ("§ 1306.04 is not a civil regulation but instead an interpretive one that defines the circumstances subjecting practitioners to criminal prosecution.").

### III.

Next, Ms. Bennett claims that the district court erroneously denied a mistrial following alleged prejudicial testimony. We review such denials for abuse of discretion, subject to harmless error review, with the following principles in mind:

> If a defendant moves for a mistrial on the grounds that the jury heard prejudicial testimony, a new trial is required only if there is a significant possibility that the prejudicial evidence had a substantial impact upon the jury verdict, viewed in light of the entire record. If the evidence is so prejudicial that the jury will unlikely be able to erase it from their minds, then a mistrial should be ordered.[26]

"'We give great weight to the trial court's assessment of the prejudicial effect of the evidence, and prejudice may be rendered harmless by a curative instruction.'"[27] "When denying a motion for a mistrial, the district court abuses its discretion, giving rise to reversible error, only 'if the evidence, when viewed in the context of the whole trial, is so highly prejudicial that it would have had a substantial impact on the jurors' verdict.'"[28]

Ms. Bennett claims that two separate instances of prejudicial testimony merited a mistrial. The first instance occurred when Thompson, a supervisor of a unit at the Mississippi Department of Human Services, testified the following: "[W]e went by there actually to try to interview the Bennetts in their home, and Mr. Bennett . . . was actually the one who said, you know, 'We have nothing to say, and slammed the door in our face, so that was the end of our conversations with them. He informed us that he did have an attorney, and so

---

[26] *United States v. Zamora*, 661 F.3d 200, 211 (5th Cir. 2011) (internal quotation marks and citations omitted).

[27] *Lucas*, 516 F.3d at 345 (quoting *United States v. Valles*, 484 F.3d 745, 756 (5th Cir. 2007)).

[28] *United States v. Delgado*, 672 F.3d 320, 340 (5th Cir. 2012) (quoting *United States v. Baresh*, 790 F.2d 392, 402 (5th Cir. 1986)).

we respected his right to counsel." Ms. Bennett argues that the sole aim of this testimony "was simply to tell the jury that the Bennetts are bad because they used their Constitutional fifth [sic] Amendment right to not make a statement, and are therefore guilty in the mind of the government." The second instance occurred when Lentz, the bankruptcy trustee, testifying about the civil bankruptcy proceeding, stated that "Ms. Bennett showed up and said that she wanted to have a lawyer present." Ms. Bennett again claims that the government offered this evidence "to make it appear that Sherrie Bennett was hiding behind her Constitutional Rights, to evade the truth."

The district court, in addressing this issue on a post-trial motion, reaffirmed its initial decision to deny Ms. Bennett's ore tenus and written motions for a mistrial. As to Thompson's testimony, the court noted that Thompson's attempt to interview the Bennetts concerned a welfare check on Dr. Lines, rather than the charges brought against the Bennetts at trial. As to Lentz's testimony, the court held that there is no constitutional right at stake. On appeal, the Government adds that the court instructed the jury to disregard what it had heard in both instances.

Even assuming that the prosecutor impermissibly used Mr. Bennett's pre-arrest, pre-*Miranda* silence, we find no error.[29] "Fifth and Sixth Amendment rights, like Fourth Amendment rights, are personal in nature and cannot be asserted vicariously."[30] Therefore, Mr. Bennett does not speak for

---

[29] *See United States v. Ashley*, 664 F.3d 602, 604 (5th Cir. 2011) (discussing circuit split on whether and when pre-arrest, pre-*Miranda* silence can be used in the government's case in chief).

[30] *United States v. Fortna*, 796 F.2d 724, 732 (5th Cir. 1986).

No. 17-60038

Ms. Bennett.[31] Additionally, Ms. Bennett's argument concerning Lentz's testimony fails. Ms. Bennett's statement that she wanted a lawyer present at an injunction proceeding in a civil bankruptcy case is plainly not relevant. Moreover, the district court promptly and unequivocally instructed the jury to disregard Thompson's and Lentz's testimony, curing any prejudicial effect.[32]

## IV.

Ms. Bennett next argues that the district court erroneously denied her post-trial motion on the basis of prosecutorial misconduct. "In attempting to establish that a prosecutor's improper comments constitute reversible error, the criminal defendant bears a substantial burden. We do not lightly make the decision to overturn a criminal conviction on the basis of a prosecutor's remarks alone."[33] "We also presume that a jury can and will follow an instruction that attorneys' statements are not evidence, 'unless there is an overwhelming probability that the jury will be unable to follow the instruction and there is a strong probability that the effect is devastating.'"[34] "The ultimate

---

[31] The cases that Ms. Bennett cite do not challenge this principle. *United States v. Okatan* is out-of-circuit precedent in which the government used a defendant's pre-arrest, pre-*Miranda* silence, an issue that we have yet to resolve and need not do so here, as *substantive* evidence of *that* defendant's guilt. 728 F.3d 111, 120 (2d Cir. 2013). *United States v. Hale* presents a wholly different factual scenario than the case at bar—that a prosecutor may not cross-examine a defendant about his silence during a custodial police interrogation. 422 U.S. 171, 181 (1975). And, *United States Department of Labor v. Triplett* is not about standing to object in court, but rather about third-party standing to sue in the line of *Pierce v. Soc. of Sisters*, 268 U.S. 510 (1925) and *Singleton v. Wulff*, 428 U.S. 106 (1976). 494 U.S. 175, 720 (1990).

[32] *Lucas*, 516 F.3d at 345 (quoting *Valles*, 484 F.3d at 756).

[33] *United States v. Virgen-Moreno*, 265 F.3d 276, 290 (5th Cir. 2001) (citations omitted).

[34] *United States v. Valencia*, 600 F.3d 389, 410 (5th Cir. 2010) (quoting *United States v. Morganfield*, 501 F.3d 453, 468 (5th Cir. 2007)).

No. 17-60038

question for this court is 'whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict.'"[35]

This already narrow standard of review is further constrained by Ms. Bennett's failure to object to all but one instance of alleged prosecutorial misconduct. Aside from Ms. Bennett's objection to certain remarks in the prosecutor's rebuttal, which we review for abuse of discretion, Ms. Bennett bears the burden of demonstrating that the prosecutor's statements constitute plain error.[36] That is, Ms. Bennett must show "'(1) error, (2) that is plain, and (3) that affects substantial rights."[37] "If these conditions are present, we may exercise our discretion to correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings.'"[38]

A.

Ms. Bennett alleges that the first instance of prosecutorial misconduct occurred during the Government's opening when the prosecutor made several misstatements that were not later supported by evidence. These statements include: (1) Ms. Bennett "put herself on as Dr. Lines power of attorney;" (2) Ms. Bennett "made herself beneficiary of Dr. Lines' will;" (3) Ms. Bennett "made Dr. Lines purchase a house next door to her and live there, where she kept him in squalor to control him;" (4) Ms. Bennett had medical power of attorney over Dr. Lines; (5) Ms. Bennett made herself the beneficiary of two life insurance

---

[35] *United States v. Anchondo-Sandoval*, 910 F.2d 1234, 1238 (5th Cir. 1990) (quoting *United States v. Iredia*, 866 F.2d 114, 118 (5th Cir. 1989)); *see also United States v. Mendoza*, 522 F.3d 482, 491 (5th Cir. 2008) ("'Improper comments by a prosecutor may constitute reversible error where the defendant's right to a fair trial is substantially affected.'") (quoting *United States v. Andrews*, 22 F.3d 1328, 1341 (5th Cir. 1994)).

[36] *United States v. Valas*, 822 F.3d 228, 242–43 (5th Cir. 2016) ("We review the preserved issues for abuse of discretion and the unpreserved issues for plain error.") (citations omitted).

[37] *United States v. Valencia*, 600 F.3d 389, 409 (5th Cir. 2010) (quoting *United States v. Mares*, 402 F.3d 511, 520 (5th Cir. 2005)).

[38] *Id.* (internal quotation marks omitted).

13

policies; and (6) Ms. Bennett had Dr. Lines fire his long-time friend and accountant by falsely claiming that he was stealing from the Clinic.[39]

The district court determined that the prosecutor's opening statement represented a roadmap of what the Government indicated would be its case-in-chief. More importantly, the court observed that "[e]vidence pertaining to the statements were introduced at trial, and the jury was free to accept or reject that evidence." Accordingly, the court concluded that Ms. Bennett had failed to show that her substantial rights had been affected—a conclusion further bolstered by the multiple instructions provided to the jury that attorney statements are not evidence.

Upon review of the record, we find no error. The jury heard testimony that Ms. Bennett was appointed Dr. Lines' power of attorney;[40] that Ms. Bennett helped him buy a home next door to her[41] where he lived in a state of

---

[39] While Ms. Bennett employs quotation marks, she does not directly quote from the trial transcript.

[40] On this issue, Ms. Bennett testified as follows:

Q. I want to make sure you're asked about this. You had a—could you describe what you had with respect to the power concerning his medical issue? Just describe one time just to make sure they're clear on that, what that was.

A. Yes, sir. After he had the cardiac problem at Biloxi Regional when Dr. McNair sent him to the Biloxi Regional for the cardiac arrhythmia, Dr. Lines— at that time, Eric Dahlhauser, who lived in Nashville, Tennessee, I think held his power of attorney. And Dr. Lines said, you know, "I really need to change that where someone who is close to me, near me, if something should happen." He was really specific with the cardiologist that if something should happen in the procedure, he did not want to be resuscitated and that was his wishes. And he did put me on his power of attorney.

[41] Eric Dalhauser, Dr. Lines' former accountant, testified that "[t]here was another home that was -- that Sherrie helped Dr. Lines buy right next to her."

degradation;[42] that Ms. Bennett was a named beneficiary of his will[43] and life insurance policies;[44] and that Ms. Bennett assisted in the firing of Dr. Lines' long-time friend and accountant by alleging that he was stealing funds from Dr. Lines.[45] As the district court properly observed, the jury was free to accept or reject this testimony. Moreover, the court instructed the jury at the start of trial and during opening statements that attorney statements are not evidence, rendering any prejudice harmless. We therefore find that the court did not plainly err.

## B.

Ms. Bennett alleges that the second instance of prosecutorial misconduct occurred when the Government proffered false discovery. This alleged misconduct specifically arose when the Government, during discovery, proffered a list of people who had received prescriptions from Dr. Lines only to then reveal through a witness at trial that the list included patients from a

---

[42] As mentioned, Thompson's testimony concerned his visit to Dr. Lines' home and his evaluation of "whether or not it appeared to be in a neglectful-type environment."

[43] On cross-examination, after Dahlhauser testified that "my understanding is the will was finally changed to where maybe Sherrie was the sole beneficiary," the jury heard the following:

Q. Okay. Because Dr. Lines was able to do what he wanted to do; right? You told him—let me rephrase that. You told him, 'You don't have to do that, Dr. Lines,' but he knew what he wanted to do?

A. With the guidance of Sherrie. I really think in 2000—starting somewhere— Dr. Lines really relied, you know, heavily on me and then on Sherrie for guidance and would follow most direction. So he did—I mean, you know, 2009, 2010, you know, he was starting to struggle, and again, the reason Sherrie asked for the return of my interest in Cedar Lake is supposedly he didn't remember. So he was struggling.

[44] James Grunwald, an FBI agent, testified that the beneficiaries on two of Dr. Lines' life insurance policies were changed to the Bennetts on June 30, 2009.

[45] Dalhauser, Dr. Lines' former accountant, testified that "I had heard, you know, and understood that Sherrie also told him that I was embezzling or stealing funds or she had to have—and actually I think also asked the FBI to investigate me."

No. 17-60038

different physician, Dr. Laurence Line (without an "s") who practiced in Hattiesburg. Ms. Bennett argues that the defense relied upon this list to formulate a defense strategy, namely that "Dr. Lines was a multi-board certified doctor, who helped many people beyond cancer patients, and he did not keep medical charts on many people, despite regulations."

The district court found that no prosecutorial misconduct occurred here because both parties were equally mistaken about the list. Nonetheless, the court considered Ms. Bennett's argument under both *Giglio v. United States*[46] and *Brady v. Maryland*,[47] determining that neither case was on point because the true evidence in this case was inculpatory rather than exculpatory. On appeal, the Government reiterates that the production of an inaccurate list was an honest mistake that neither party recognized and did not involve fabrication of evidence or some other overt bad act.

Reviewing this instance of alleged prosecutorial misconduct for plain error or abuse of discretion is of no moment. By either metric, no error occurred in the district court's rejection of this claim.[48]

C.

Ms. Bennett alleges that the third instance of prosecutorial misconduct occurred during the Government's rebuttal following defendants' closing. Ms. Bennett contends that the italicized portions of the following statement during the prosecutor's rebuttal were improper:

---

[46] *Giglio v. United States*, 405 U.S. 150, 154 (1972) (holding that a prosecutor's promise to a witness that he would not prosecute if he cooperated was enforceable against the government even where the prosecutor did not have authority to make the statement).

[47] *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding that a prosecutor may not withhold potentially exculpatory evidence from the defense).

[48] *United States v. Holley*, 463 F.2d 634, 638 (5th Cir. 1972) ("A criminal defendant is entitled to a fair trial, but not every prosecutorial ineptitude can be magnified into a colossus mandating a reversal.").

Ladies and gentlemen, *I've only got eight minutes, and I don't have enough time to contradict all the misrepresentations about the facts that you've heard over the last two hours.* I'm going to trust you because I—because that's what we do in this system of justice. We trust your memory.

I'm not going to go into all what Vice-president Biden would call *malarkey* that you just heard, but we also heard, and *I can't not address it, some of the most offensive things I have ever heard in a courtroom.*

Mr. Carlisle's theory of the case is that we're only here, the case was fabricated, because Kim Lentz wanted to make money. That's all the reason we're here. *I charged this case. I didn't charge it because Kim Lentz made some money.* And then he came and said to you not only was the case fabricated, but these agents got on the stand and the *prosecutor* only did this because we gotta get a conviction, no matter what. *My salary is the same whether those people go home or they go to jail. I am not here to convict an innocent person. I have never, to my knowledge, convicted an innocent person. And for them to suggest that, that these agents are getting on the stand solely in order to promote their careers and they're going to do whatever it takes, is the most offensive thing I think I've ever heard in a courtroom.*

Now, let me address some of the things—not the factual matters that they told you incorrectly, but let me tell you some other things that they didn't tell you. And it's absolutely true that the defense has no burden whatsoever to put on any evidence. None. They don't have to put on a witness, they don't have to put on a document, and they don't have to do anything. But nothing stops them from it. Nothing stops them from issuing a subpoena for the bank records they claim that the government hid from you.[49]

They don't have to put on anything, but they have subpoena power. *And the reason we didn't put on any of those patient records or any of those patients is because they don't exist. We asked the clinic -- and I think there's actually a document in there where the clinic*

---

[49] Ms. Bennett objected, stating that the prosecutor is "now trying to shift the burden." In response, the district judge instructed the jury that "you've been instructed more than once, and I remind you again, the defendants are under no obligation to produce any evidence whatsoever."

*responded to a subpoena where we were asking for them and they said, 'We don't have them.'*[50]

. . .

Now, the last thing I want to say, because there's an awful lot more in my notes and I can't get to any amount of them, the defendants really loved that little chart that they showed. They both showed it to you. And their idea of what was reasonable doubt and what's not reasonable doubt is fine, but there's an instruction, it's Instruction Number Three, and the Court told you what reasonable doubt is. And that's what you ought to follow, not some chart that—I don't know where it came from. I guess since both of them used it, most defense lawyers must have it. But the actual instruction is written in Instruction Three.[51]

Ms. Bennett first argues that the prosecutor improperly shifted the burden of proof and suggested that evidence not presented at trial provides additional grounds for Ms. Bennett's guilt. For example, the prosecutor insisted that "nothing stops [the Defendants] from issuing a subpoena for the bank records they claim that the government hid from you" and that "[t]hey

---

[50] Ms. Bennett objected to the prosecutor's discussion of the subpoena power. The district judge subsequently instructed the jury that "no inference whatsoever can be drawn from the fact that the defendants may or may not have produced any evidence whatsoever. They are under no obligation to do so."

[51] Ms. Bennett objected to the prosecutor's comments about the chart, and the district judge gave a curative instruction, in the jury charge, regarding the burden of proof as a result. On appeal, Ms. Bennett argues that "the prosecutor intentionally misrepresented the burden of proof, to the jury, and specifically disputed that the burden of 'beyond reasonable doubt,' is not greater than other burdens such as, 'preponderance,' 'highly likely guilt,' or 'likely guilt.'" While we find the prosecutor's comments needlessly sarcastic and dismissive, the prosecutor referred the jury to the Court's instruction on reasonable doubt. Therefore, we find no error.

don't have to put on anything, but they have subpoena power."[52] We "do not approve of comments reflecting on the lack of evidence presented by a defendant in a criminal case . . . [as] [s]uch a course of action is a parlous one at best, of necessity sailing close to implying that the defendant is obligated to produce evidence of his innocence."[53] Similarly, we "have condemned suggestions that evidence not presented at trial would compel a finding of guilty."[54] Because the prosecutor contravened these well-settled rules, we have no problem concluding that these remarks were improper.

Ms. Bennett next argues that the prosecutor made himself a witness on multiple occasions. Specifically, Ms. Bennett takes issue with the first-person statements in the prosecutor's rebuttal. We recognize that "closing argument is just that—argument—we allow prosecutors to use expressive language and 'a bit of oratory and hyperbole' in arguments."[55] "[W]e generally place statements characterizing a defendant's positions or arguments as 'ridiculous, absurd, and insulting' in this category."[56] At the same time, it is well-established that a prosecutor may "'not express his personal opinion on the

---

[52] After arguing that the Bennetts had subpoena power, the prosecutor continued, explaining: "And the reason we didn't put on any of those patient records or any of those patients is because they don't exist. We asked the clinic—and I think there's actually a document in there where the clinic responded to a subpoena where we were asking for them and they said, 'We don't have them.'" Ms. Bennett argues that the prosecutor misrepresented the truth because the Government only asked for records of Ms. Bennett and her family, not records pertaining to all patients of the Clinic.

The district court agreed that "there is no one specific item of evidence in the record . . . which indicates that the Government sought every medical file from Cedar Lake Oncology," but concluded that the prosecutor's statement was a reasonable inference from the evidence presented at trial. The district court's curative instructions concerning the subpoena power and evidence supporting Ms. Bennett's guilt mitigate the prejudicial effect, if any, from this particular comment.

[53] *Anchondo-Sandoval*, 910 F.2d at 1238 (internal quotation marks omitted).

[54] *United States v. Carter*, 953 F.2d 1449, 1460 (5th Cir. 1992); *see also Bowen*, 818 F.3d at 191.

[55] *United States v. Boyd*, 773 F.3d 637, 645 (5th Cir. 2014) (quoting *United States v. Thompson*, 482 F.3d 781, 786 (5th Cir. 2007)).

[56] *Id.* (quoting *United States v. Bush*, 451 F. App'x 445, 451 (5th Cir. 2011)).

merits of the case or the credibility of witnesses.'"[57] The prosecutor here defied that rule when he expressed his personal opinion on the merits of the case—the defenses' summation was "the most offensive thing I have heard in a courtroom"—and the credibility of his witnesses—"it is the most offensive thing I think I've heard in a courtroom" "to suggest that, that these agents are getting on the stand solely to promote their careers and they're going to do whatever it takes." Therefore, we find such remarks improper.

The third and final category of prosecutorial comments is the most disturbing. In rebuttal, the prosecutor argued, "I am not here to convict an innocent person. I have never, to my knowledge, convicted an innocent person." In *Hall v. United States*, we considered a similar statement made by the prosecutor—"we try to prosecute only the guilty"—and explained:

> Expressions of individual opinion of guilt are dubious at best. . . . This statement takes guilt as a pre-determined fact. The remark is, at the least, an effort to lead the jury to believe that the whole governmental establishment had already determined appellant to be guilty on evidence not before them. . . . Or, arguably it may be construed to mean that as a pretrial administrative matter the defendant has been found guilty as charged else he would not have been prosecuted, and that the administrative level determination is either binding upon the jury or else highly persuasive to it. Appellant's trial was held and the jury impaneled to pass on his guilt or innocence, and he was clothed in the presumption of innocence. The prosecutor may neither dispense with the

---

[57] *Id.* (quoting *United States v. Alaniz*, 726 F.3d 586, 616 (5th Cir. 2013) (finding improper prosecutor's comments about defense's theory as "one of the most preposterous things I've heard in my life" and "one of the dumbest things I have ever heard"); *see also, e.g.*, *United States v. Smith*, 814 F.3d 268, 274 (5th Cir. 2016) ("We have repeatedly admonished that a prosecutor 'may not state, 'The prosecution's witnesses are telling the truth' or 'I believe that the prosecution's witnesses are telling the truth.'") (quoting *United States v. Morris*, 568 F.2d 396, 402 (5th Cir. 1978)); *Bowen*, 818 F.3d at 191 (finding that prosecutor's closing argument constituted improper vouching when prosecutor argued that "government witnesses should be credited because they would be 'called to task' pursuant to their plea agreements for any dishonesty"); *United States v. Ramirez-Velasquez*, 322 F.3d 868, 875 (5th Cir. 2003) ("The [government] . . . went too far in arguing that, as a rule, federal law enforcement agents appear in court and tell the truth.") (citation omitted).

presumption of innocence nor denigrate the function of the trial nor sit as a thirteenth juror.[58]

"This entire line of argument presume[s] that the whole government apparatus, and the prosecutor individually, had reached a determination of the defendant's guilt before the trial."[59] In short, such commentary is indefensible and holds no place in federal court.[60]

The Government agrees that several of the prosecutor's statements, in particular his first-person statements, were improper, but argues that the rebuttal was aimed at highly-charged allegations from the defense, namely that the bankruptcy trustee, law enforcement officers, and prosecutors brought this case for personal gain. Specifically, the Government refers to the italicized portions of defendants' closing:

> Even Kim Lentz, who met with [Dr. Lines], she claims that whenever she fired Dr. Lines and Sherrie, that they—that they left but she called Dr. Lines back in, in all her detailed notes, *for which she was paid ungodly hundreds of thousands of dollars, her, her husband, and junior, paid all these hundreds of thousands of dollars that she can't even remember how much they were paid it was so much, getting paid, you know, hundreds of thousands to do what Sherrie Bennett got no extra money to do, by the way.* You know, Sherrie Bennett's money never went up. She was paid—her salary was set all the way back in the Dahlhauser days, but when she had to take on this new task of bankruptcy issues, she got no extra pay. But even Kim Lentz did not write down a single note in all her detailed notes that there was something wrong with Dr. Lines, because that clearly would be an issue that you should address. That would be of concern with anybody.
>
> . . .

---

[58] 419 F.2d 582, 587 (5th Cir. 1969).

[59] *United States v. Garza*, 608 F.2d 659, 665 (5th Cir. 1979).

[60] *Smith*, 814 F.3d at 275 (finding impermissible the "prosecutor's remark . . . that the Government had no incentive to try [the defendant] unless he were in fact guilty"); *Garza*, 608 F.3d at 664–65 (finding improper the prosecutor's statements that "the Government has no interest whatsoever in convicting the wrong person" and that "if I ever thought that I had framed an innocent man and sent him to penitentiary, I would quit").

[The Government] – it's just so much, so much that's *disturbing* about what we see about what they did.

. . .

And also *Ms. Lentz would not have been there if Sherrie Bennett was there*. She gets appointed, she makes hundreds of thousands of dollars for her family and her firm, but they get zero if Sherrie Bennett is there and if Dr. Lines is there.

. . .

*Why are we here? I can tell you several hundred thousand reasons we're here, maybe half a million reasons we're here. We're here because Kim Lentz stood to make a lot of money for her and her firm, over $300,000 between her and her husband.* She said, 'I worked on the case 18 months.' That didn't mean she worked every day, y'all. Remember, she's going to 341 hearings, she's having other hearings, she's doing other things. That might have been a few hours a month. It took 18 months to close the case out, but she made over $300,000. *That's the reason we're here, and that's why this case is fabricated.*

. . .

*All—most of the government's witnesses have a stake in this case. You've got Agent Grunwald. This is a performance. They grade you. That's how you get promoted, the more convictions you get. That's how the DEA works.* That's how you go from regular agent up to field agent up to I don't know all the—all the different ranks, but you do it by having successes.

And then all these people have a bias. And I'm not saying it in a bad sense. I want FBI agents to do their job. I want DEA agents to do their job. I want police to do their job. I want safe streets. I don't have a problem with that. And them having a bias is because they take it on, but they have a bias. *And they're here because either they believe, wrongfully, or they just sunk their teeth in it so bad that they've got to get a conviction of Jerry Bennett, no matter what it takes.*

Even in the wake of defenses' summation, the prosecutor's rebuttal was not permissible. To be sure, the Supreme Court has instructed that "[i]n order to make an appropriate assessment, the reviewing court must not only weigh

the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo."[61] At the same time, two wrongs do not make a right.[62]

Closing argument is "'to assist the jury in analyzing, evaluating, and applying [t]he evidence.'"[63] In particular, "'[a] prosecutor is confined in closing argument to discussing properly admitted evidence and any reasonable inferences or conclusions that can be drawn from that evidence.'"[64] "'We have repeatedly chastised federal prosecutors for making improper remarks in closing arguments,'" such as the ones made here.[65] We repeat: federal prosecutors "may not suggest that evidence which was not presented at trial provides additional grounds for finding defendant guilty" and "may not express . . . personal opinion[s] on the merits of the case or the credibility of witnesses."[66]

With those principles in mind, we refuse to chalk up the prosecutor's outright defiance of these elementary principles of advocacy as permissible "tit-for-tat." The prosecutor, by alluding to evidence not presented at trial, personally opining on the case and his witnesses, and denigrating the presumption of innocence, "roam[ed] beyond the evidence presented at trial," opting for the "improper, even pernicious" route of invoking his "personal

---

[61] *United States v. Young*, 470 U.S. 1, 12 (1985).

[62] *Id.* at 11.

[63] *Garza*, 608 F.2d at 662 (quoting *Morris*, 568 F.2d at 401).

[64] *Bowen*, 818 F.3d at 191 (quoting *United States v. Ceballos*, 789 F.3d 607, 624 (5th Cir. 2015)).

[65] *Id.* (quoting *United States v. Rodriguez-Lopez*, 756 F.3d 422, 433–34 (5th Cir. 2014) (citing cases)); *see also United States v. Diaz-Carreon*, 915 F.2d 951, 956–57 (5th Cir. 1990) ("Persistent inflammatory or misleading comments must be viewed with alarm.").

[66] *Garza*, 608 F.2d at 663.

status as the government's attorney" to serve as a basis for the conviction of Ms. Bennett—a route that we have time and again denounced.[67]

Having determined that the prosecutor's remarks were improper, we proceed to the second step of our analysis and determine whether the prosecutor's rebuttal affected Ms. Bennett's substantial rights. That is, "whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict."[68] To answer this inquiry, we generally look to the following three factors: "(1) the magnitude of the prejudicial effect of the prosecutor's remark, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction."[69]

As to the first factor, we "look[] at the prosecutor's remarks in the context of the trial in which they were made and attempt[] to elucidate their intended effect."[70] Bearing that in mind, "we cannot say the prosecutor's statements overshadowed what had come before" in this nearly two-week trial in which the jury heard almost six full days of testimony from thirty-five different witnesses and received over 200 exhibits that were admitted into evidence.[71]

---

[67] *See, e.g.*, *Bowen*, 818 F.3d at 191 (finding that prosecutor's rebuttal, while responsive to the defendant's closing arguments, did not draw on evidence before the jury and thus was improper); *United States v. McCann*, 613 F.3d 486, 496 (5th Cir. 2010) ("[T]he factual contents of the Closing Comment were limited to evidence that was in the record" whereas the "Rebuttal Comment was a largely emotional appeal to the jury to credit the arresting officers' testimony because they were police officers."); *Ramirez-Velasquez*, 322 F.3d at 875 (finding that the prosecutor "exceeded the range of response necessary to 'right the scale'" when arguing that "as a rule, federal law enforcement agents appear in court and tell the truth"); *United States v. Gallardo-Trapedo*, 185 F.3d 307, 320 (5th Cir. 1999) (finding that government may "respond to defense attorney's statement . . . but cannot base arguments on facts not in evidence or cloak . . . witness[es] in the protective mantle of the United States government").

[68] *United States v. Weast*, 811 F.3d 743, 752 (5th Cir. 2016) (internal quotation marks omitted).

[69] *Id.* (internal quotation marks omitted).

[70] *Gallardo-Trapero*, 185 F.3d at 320.

[71] *Id.* (determining that prosecutor's improper vouching did not taint "strident advocacy on both sides of this case and the numerous witnesses, pieces of evidence, and issues placed before the jury").

No. 17-60038

In addition, the district court helped mitigate any prejudicial effect by instructing the jury on multiple occasions. Specifically, as to the prosecutor's comments that improperly shifted the burden and alluded to additional evidence not presented at trial, the court responded to Ms. Bennett's objections with prompt and unequivocal instructions: first, in response to the prosecutor's comment that Ms. Bennett could have issued a subpoena for bank records, the court instructed the jury that "you've been instructed more than once, and I remind you again, the defendants are under no obligation to produce any evidence whatsoever;" and second, in response to the prosecutor's comment that Ms. Bennett had subpoena power, the court again reminded the jury that "no inference whatsoever can be drawn from the fact that the defendants may or may not have produced any evidence whatsoever. They are under no obligation to do so." As to the remainder of the prosecutor's remarks, which Ms. Bennett did not object to, the court, at the start of trial, during opening statements, prior to closing arguments, and in the charge, issued generalized instructions that "what the attorneys say is not evidence." "We presume that such instructions are followed unless there is an overwhelming probability that the jury will be unable to follow the instruction and there is a strong probability that the effect is devastating."[72]

This brings us to the final factor of our consideration—the strength of the government's case against the defendant. We find that Ms. Bennett's conviction was supported with strong evidence of her guilt. As mentioned, the Government was required to prove that (1) the Defendants distributed or

---

[72] *United States v. Gracia*, 522 F.3d 597, 604 (5th Cir. 2008) (explaining that merely generic cautionary instructions may be able to "purge the taint of a prosecutor's prejudicial comments"); *see also Gallardo-Trapero*, 185 F.3d at 321 (determining that a generalized instruction to the jury to base its decision solely upon the testimony and evidence presented helped to mitigate any prejudicial effect); *United States v. Fields*, 72 F.3d 1200, 1207 (5th Cir. 1996) (explaining that we afford "considerable weight" to the district court's "on-the-scene assessment of the prejudicial effect").

dispensed a controlled substance; (2) that the Defendants acted knowingly and intentionally; and (3) that Defendants did so for other than a legitimate medical purpose and outside the usual course of professional practice. The Government proved those elements with the following evidence: (1) Ms. Bennett, in collaboration with her husband, took advantage of Dr. Lines to procure prescriptions for controlled substances for themselves and their family members; (2) Ms. Bennett, in fact, obtained prescriptions for controlled substances for her and her family members; (3) None of the prescriptions were supported by medical files in the Clinic indicating that the recipients were Clinic patients; and (4) Ms. Bennett effectively wrote these prescriptions using Dr. Lines' DEA number and tracing a signature stamp embossed with Dr. Lines' signature.

Likewise, the bankruptcy charges were well supported. The Government was required to prove that Ms. Bennett had access to the bankruptcy estate and that she knowingly and fraudulently appropriated to her own use, embezzled, spent, and transferred property belonging to that estate. In proving those elements, the Government presented the following evidence: (1) Ms. Bennett had access to the Clinic's accounts during the bankruptcy proceedings; and (2) Ms. Bennett had written and cashed three checks, depositing similar amounts in her own checking account. Lastly, the jury heard, and rejected, Ms. Bennett's version of events.

Taken together, these factors persuade us that the prosecutor's rebuttal, although disturbing and unprofessional, did not compromise Ms. Bennett's

substantial rights.[73] We have reversed convictions in the past for improper prosecutorial comments when the "most important problem facing the jury was its decision whether to credit the testimony of the . . . government witnesses, or that of the defendant[s]."[74] The case before us does not solely turn on credibility. Therefore, in light of the evidence in the record and the court's curative instructions, we find that the court neither abused its discretion nor committed plain error in denying a mistrial or a new trial based on alleged prosecutorial misconduct.

## V.

Ms. Bennett next claims that the district court erred when it allowed the prosecution to amend the indictment. This Court reviews a constructive amendment claim *de novo*.[75] "In reviewing a claim of constructive amendment, however, we are mindful to distinguish between a constructive amendment, which is reversible per se, and a variance between the indictment and proof, which we examine for harmless error."[76]

> We scrutinize any difference between an indictment and a jury instruction and will reverse only if that difference allows the defendant to be convicted of a separate crime from the one for

[73] *See, e.g.*, *Bowen*, 818 F.3d at 191 (holding prosecutor's improper vouching did not constitute reversible error because of overwhelming evidence supporting conviction); *Valas*, 822 F.3d at 247 (holding that prosecutor's comment shifting the burden did not constitute reversible error because court gave curative jury instruction); *Boyd*, 773 F.3d at 645–46 (holding prosecutor's improper vouching did not constitute reversible error because of strong evidence of guilt); *Gallardo-Trapero*, 185 F.3d at 321 (holding prosecutor's improper vouching did not constitute reversible error because of overwhelming evidence supporting conviction); *Diaz-Carreon*, 915 F.2d at 957–58 (holding prosecutor's comments shifting the burden, among others, did not constitute reversible error due to "defense counsel's failure to preserve error and the district court's able use of firm curative instructions"); *Anchondo-Sandoval*, 910 F.2d at 1238 (holding that prosecutor's comments shifting the burden and opining on the merits of the case did not constitute reversible error in light of court's instructions).

[74] *Garza*, 608 F.2d at 666 (holding prosecutor's improper vouching constituted reversible error when conviction turned on credibility); *see also, e.g.*, *Gracia*, 522 F.3d at 606 (same); *Smith*, 814 F.3d at 267–77 (same).

[75] *United States v. Jara-Favela*, 686 F.3d 289, 299 (5th Cir. 2012).

[76] *Id.* (citing *United States v. Adams*, 778 F.3d 1117, 1123 (5th Cir. 1985)).

which he was indicted. Otherwise, we review the purported amendment as a variance, and the defendant must show how the variance in the language between the jury charge and the indictment so severely prejudiced his defense that it requires reversal under harmless error review.[77]

Ms. Bennett argues that the jury instructions used the disjunctive "or" in each count where the conjunctive "and" had been used in the indictment, changing "distributing **and** dispensing controlled substances" to "distributing **or** dispensing controlled substances" and changing "embezzling, spending, **and** transferring property" to "embezzling, spending, **or** transferring property." Ms. Bennett argues that notes sent from the jury during deliberations indicate that the jury noticed this discrepancy and that this discrepancy affected the verdict. Relying on *Sitrone v. United States*,[78] Ms. Bennett argues this constitutes a constructive amendment of the indictment, thereby violating her Fifth Amendment rights.

The district court correctly determined that *United States v. Holley* and *United States v. Haymes* foreclose relief on these grounds.[79] In *Holley*, citing to *Haymes*, we stated that "[i]t is well-established in this Circuit that a disjunctive statute may be plead conjunctively and proved disjunctively."[80] In *Haymes*, like here, the statute used "or," the indictment used "and," and the court charged the jury using "or."[81] We rejected the argument that these

---

[77] *Id.* at 300 (internal quotation marks and citations omitted).

[78] 361 U.S. 212, 215–19 (1960).

[79] *United States v. Holley*, 831 F.3d 322, 328 (5th Cir. 2016) ("Although the indictment listed these different ways of violating § 841(a) using 'and' rather than 'or,' the Government still only had to prove that Holley conspired to violate the statute in *one* of these four possible ways.") (citing *United States v. Haymes*, 610 F.2d 309, 310 (5th Cir. 1980) (per curiam) ("It is well-established in this Circuit that a disjunctive statute may be pleaded conjunctively and proved disjunctively.").

[80] *Holley*, 831 F.3d at 328 n.14.

[81] *Haymes*, 610 F.2d at 310–11.

differences meant the government improperly amended its indictment. That is the argument before us now, and we reject it once again.

## VI.

Finally, Ms. Bennett challenges the sufficiency of the evidence presented against her. Where a defendant moves for acquittal in the district court, this Court reviews sufficiency of the evidence challenges *de novo*.[82] On reviewing the record, this Court asks "whether, considering the evidence and all reasonable inferences in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[83]

Ms. Bennett first argues that the Government failed to prove the controlled substances charges because the Government did not meet its burden of showing that the drugs dispensed were "for other than a legitimate medical purpose and outside the usual course of professional practice." Specifically, she argues that the Government did not dispute that the persons named in the prescriptions had medical needs for the drugs prescribed, and thus failed to demonstrate what she argues is a required element—that the drugs were not for a legitimate medical purpose. Next, Ms. Bennett disputes the bankruptcy charges, arguing that the bankruptcy guidelines were vague and repeating her trial testimony that she wrote the three checks for a legitimate purpose and that she attempted to conform her actions to the law. In her reply brief, she contends that thirty-eight highly skilled and educated people who had contact with Dr. Lines failed to contemporaneously document any incompetence and, while weighing evidence is a question for the jury, the prosecution's case was not as strong as the Government makes it sound.

---

[82] *United States v. Danhach*, 815 F.3d 228, 235 (5th Cir. 2016).

[83] *United States v. Vargas-Ocampo*, 747 F.3d 299, 303 (5th Cir. 2014) (en banc).

The district court, addressing Ms. Bennett's arguments on a post-trial motion, recited the elements for each charge and concluded that a reasonable trier of fact could have found each element of each count of the indictment.

Considering the record in the light most favorable to the prosecution, we find that the evidence presented sufficiently supports Ms. Bennett's conviction. Ms. Bennett's first argument—that the Government failed to prove that prescriptions were not for a legitimate medical purpose—is of no legal consequence. We have held that "knowingly distributing prescriptions outside the course of professional practice is a *sufficient* condition to convict a defendant under the criminal statutes relating to controlled substances."[84] As we explained *supra*, the Government presented evidence that showed that Ms. Bennett, in collaboration with Mr. Bennett, procured prescriptions for controlled substances outside the course of professional practice. Based on that evidence, a rational trier of fact could have found the elements of the crime beyond a reasonable doubt.[85]

Similarly, Ms. Bennett's argument concerning the sufficiency of the evidence for the bankruptcy charges fails. The jury was not required to credit Ms. Bennett's testimony and proffered evidence that she attempted to comply with the bankruptcy regulations and that she did not fraudulently transfer funds from the bankruptcy estate. Again, as we explained *supra*, the Government presented sufficient evidence for a rational trier of fact to conclude that Ms. Bennett had access to the bankruptcy estate's accounts and that she

---

[84] *Armstrong*, 550 F.3d at 397 (emphasis added) ("[A] practitioner is unauthorized to dispense a controlled substance if the prescription *either* lacks a legitimate medical purpose *or* is outside the usual course of professional practice.").

[85] *Jara-Favela*, 686 F.3d at 302 ("We need not exclude every reasonable hypothesis of innocence to affirm.").

No. 17-60038

fraudulently appropriated property from the estate to her personal account. As such, Ms. Bennett's conviction stands.[86]

## VII.

The judgment of conviction and sentence is affirmed.

---

[86] *United States v. Loe*, 262 F.3d 427, 432 (5th Cir. 2001).