# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 6, 2024

Lyle W. Cayce
Clerk

———————————

No. 23-30191

———————————

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

RANDY J. LAMARTINIERE,

*Defendant—Appellant*.

———————————————————————————

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:18-CR-87-1

———————————————————————————

Before DAVIS, SMITH, and HAYNES, *Circuit Judges*.

W. EUGENE DAVIS, *Circuit Judge*:

A jury convicted Dr. Randy Lamartiniere, an internal medicine doctor, of twenty counts of unlawful distribution of controlled substances. On appeal, Lamartiniere challenges the district court's jury instructions and the sufficiency of the evidence supporting his convictions. Finding no reversible error, we AFFIRM.

## I.

## A.

At the time of his trial, Lamartiniere had been practicing as a licensed physician specializing in internal medicine for approximately thirty years. In 2012, he was hired as a staff physician at a clinic in Baton Rouge, Louisiana, operated by Ochsner Health. At first, Lamartiniere mainly saw general internal medicine patients, but that started to change in 2013 as he saw a growing number of chronic pain patients. By 2014, Ochsner began to develop concerns about Lamartiniere's management of opioid and narcotic prescriptions and his inability to timely maintain his patient records. After several warnings, Ochsner terminated Lamartiniere at the end of 2014.

Following his termination from Ochsner, Lamartiniere opened his own "direct primary care" practice in early 2015. At his new practice, patients paid a $300 membership fee in exchange for three months of medical care for any issue that arose during that time period. The practice accepted neither insurance nor Medicaid. Although Lamartiniere testified that he initially hoped to see mostly internal medicine patients, within a year of opening the practice, he had between 200-250 patients, eighty percent of whom were pain management patients.

In early 2015, shortly after Lamartiniere opened his practice, the Drug Enforcement Administration ("DEA") launched an investigation into his prescription practices after receiving a tip from a confidential informant. As part of the DEA's investigation, it recruited two undercover agents to pose as chronic pain patients seeking controlled substances from Lamartiniere. Over the course of almost six months, the undercover agents, outfitted with recording devices, visited Lamartiniere's practice a total of nine times, each time leaving with a prescription for a controlled substance. In November

2015, the DEA executed a search warrant for fifty patient files from Lamartiniere's practice.

In 2021, a superseding indictment charged Lamartiniere with twenty-eight counts[1] of unlawful distribution of Schedule II controlled substances in violation of 21 U.S.C. § 841(a)(1). Counts 1 through 7 of the superseding indictment charged him with prescribing controlled substances to seven patients on January 5, 2016, after the Louisiana State Board of Medical Examiners (the "Medical Board") suspended his state license to prescribe controlled substances. The remaining counts charged Lamartiniere with unlawfully prescribing controlled substances to the two undercover agents, Matthew Dixon and Craig Crawford, and four former patients, Charles Henson, Brian Boudreaux, Jeremy Doiron, and Fredrick Aughey.

## B.

At trial,[2] the Government called nine witnesses, including Lamartiniere's former patients, the undercover agents, and expert witnesses. Additionally, the Government played for the jury recordings of the undercover agents' appointments with Lamartiniere. Lamartiniere testified in his own defense and presented testimony from his former legal counsel. Below is a sampling of that testimony.

Both undercover agents testified about their visits with Lamartiniere between April and September 2015. Detective Dixon testified that at his first appointment, he told Lamartiniere that he had pain in his right leg from an old sports injury. After Lamartiniere conducted "some sort of examination

---

[1] The superseding indictment charged Lamartiniere with thirty counts, but the district court granted the Government's motion to dismiss two counts.

[2] This case was initially tried without a jury on December 6-7, 2021, and ended in a mistrial.

or manipulation" of Dixon's back, he diagnosed Dixon with a "disorder of [the] lower extremity."

In a recording of the visit, the jury heard Dixon tell Lamartiniere that a friend of his would "hook" him up with a "Lortab[3] or something like that" if his leg bothered him. Lamartiniere responded that getting medication without a prescription was illegal. However, he said he could prescribe some pain medication for Dixon, despite acknowledging that "Aleve, Tylenol of course will work fairly well too" and are "[a] little bit more legal." After Dixon said Aleve and Tylenol were ineffective, Lamartiniere wrote him a prescription for thirty 7.5-milligram Norco[4] pills, which he estimated would last Dixon "a couple of months, at least."

At Dixon's second appointment, he told Lamartiniere that his left leg (instead of his right leg as initially reported) was the source of his pain. Although it was only ten days after his initial appointment, Lamartiniere wrote Dixon a prescription for ninety 7.5-milligram Norco pills. Dixon then requested a prescription for Adderall, telling Lamartiniere that he took some of his co-worker's "addies"[5] and it helped him stay awake. Lamartiniere explained to Dixon that taking Adderall for that purpose was illegal and that using Adderall to stay awake was a non-indication for adult attention deficit disorder ("ADD"). However, after Dixon said a prior doctor had prescribed him ADD medication and that he had trouble focusing on various tasks, Lamartiniere eventually agreed to prescribe Dixon 20-milligrams of Adderall.

_____

[3] Lortab is a brand name for hydrocodone, a Schedule II opiate typically prescribed to treat pain.

[4] Norco is another brand name for hydrocodone.

[5] Dixon testified that "addies" is common street terminology for Adderall. Adderall, another Schedule II substance, is a stimulant.

No. 23-30191

During his next appointment, Dixon identified his right leg as the source of his pain and asked Lamartiniere for "something better" than Norcos to "make [him] feel better." Lamartiniere agreed to switch him to Percocet[6] and wrote him a prescription for ninety tablets of 10-milligram Percocet. During this appointment, Lamartiniere did not conduct a physical exam or order any medical tests before switching Dixon to a stronger medication.

During Dixon's final appointment, Lamartiniere raised concerns that there was no indication in Louisiana's prescription monitoring program ("PMP")[7] that Dixon had picked up his prior prescriptions. Dixon had previously said that he filled his prescriptions in Texas. Lamartiniere requested that going forward Dixon fill his prescriptions in Louisiana so he could track them on the PMP. He explained that in order to prescribe controlled substances, he was required to have documentation that Dixon was filling his prescriptions. Without such documentation, Lamartiniere acknowledged that he was "kind of losing track of things" and needed "to do a better job of recording" Dixon's prescriptions.

When Lamartiniere informed Dixon that he was going to drug test him, Dixon responded that he had not taken his prescribed medications in several weeks because he ran out early. Lamartiniere told Dixon this created a problem because in order to ensure prescriptions were not diverted, he needed to either drug test him or monitor his prescription refills and that he

---

[6] Percocet is a brand name for oxycodone (combined with Tylenol) and is a Schedule II opiate typically prescribed to treat pain. Oxycodone is one and a half times stronger than hydrocodone.

[7] Louisiana's PMP is a database that provides registered physicians in the state access to reports on what controlled substances were prescribed to patients and how many of those prescriptions have been filled within Louisiana.

was "doing neither of those" in Dixon's case.  He further told Dixon that "[u]nfortunately they treat doctors like they're supposed to be detectives these days.  They can take licenses [away] for not doing that kind of stuff." Although Lamartiniere emphasized that he needed Dixon's pharmacy records going forward, he still agreed to provide Dixon with his prescriptions for Adderall and Percocet.

The jury also heard testimony from Crawford, the second undercover officer, who saw Lamartiniere four times between July and September 2015. At his first visit, Crawford informed Lamartiniere that he had a weightlifting injury from ten to fifteen years ago that made his leg feel "funny."  Crawford said he did not have a prescription for pain medication, but he had gotten "a couple of roxies"[8] from his friend that made him "feel good."  Lamartiniere asked Crawford whether he had any history of drug abuse, and Crawford said, "No.  Like I said [I] take a couple of . . . ."  Lamartiniere interrupted Crawford, finishing his sentence, "[b]ut nothing on a really regular basis, not large amounts or nothing . . . ," to which Crawford responded, "No."

After Lamartiniere examined Crawford for a few minutes, he diagnosed Crawford with a nerve issue and a bulging disc.  For Crawford's pain, Lamartiniere suggested a Schedule IV narcotic, but Crawford insisted he wanted "roxies."  Lamartiniere informed Crawford that his symptoms "are really not something . . . [that] any doctor should prescribe a . . . major narcotic [for,] at least up front."  Nevertheless, Crawford left his first appointment with a prescription from Lamartiniere for forty-five 5-milligram Norco tablets.

At his next appointment, Crawford asked for a stronger prescription. Lamartiniere again suggested less addictive medications as an alternative, but

---

[8] "Roxies" is slang for Roxicodone, a brand name for oxycodone.

ultimately agreed to write Crawford a prescription for seventy-five tablets of 7.5-milligrams of Percocet. Lamartiniere warned Crawford that the "problem is all these pain medicines are addictive" and that people "develop a tolerance to them," which is especially concerning "for someone that's not really in a lot of pain as you said."

Crawford testified that at some point during his second appointment, Lamartiniere's demeanor changed when he informed Crawford that Louisiana's PMP showed no record of Crawford's filling his last prescription. Crawford told Lamartiniere he filled his prescription in Mississippi, to which Lamartiniere said he would only give Crawford one more prescription unless he came back with records confirming he had filled his prescription. Lamartiniere told Crawford it was important to fill his prescriptions in Louisiana because "they're using people like you around to catch doctors like this, so . . . that's why I have to be careful." Lamartiniere also asked Crawford about getting an MRI of his back, again emphasizing that he had to be "careful" about "treating things without an MRI or records" because it "doesn't look right."

At his third appointment, Crawford again asked Lamartiniere for stronger medication that would last longer. Lamartiniere said he could increase Crawford's dose of Percocet to 10-milligrams and give him ninety pills, but beyond that he would "really have to start thinking about . . . [having an] MRI[] done." Lamartiniere also asked Crawford to sign a pain management agreement and said that, if Crawford was unwilling to do so, he would not continue prescribing him pain medication. Yet, when Crawford refused to sign the agreement, Lamartiniere still gave him a prescription for ninety 10-milligram Percocet tablets.

At his final appointment, Crawford testified that based on his experience investigating narcotics cases, he noticed an individual in

Lamartiniere's waiting room who appeared to be under the influence of a Schedule II narcotic. Once he was taken back to see Lamartiniere, Crawford asked for another Percocet prescription because "a guy" had stolen his prior prescription. Lamartiniere told Crawford that the only way to get another prescription would be to have a police report, but that it was "hard to get police to write reports on stolen drugs because they know that some people will use that to get more medicine." Lamartiniere agreed to write Crawford another prescription for Percocet without a police report.

Charles Henson and Brian Boudreaux[9]—two of Lamartiniere's former patients—also testified. Henson testified that he suffered from a slipped disc and chemical exposure that impacted his lungs and nerves. He began seeing Lamartiniere in 2015, after his prior doctor no longer prescribed him pain medication. Henson testified that at his first appointment, Lamartiniere performed a physical examination and required Henson to provide copies of his prior MRI and CAT scans, as well as proof of his prior prescriptions.

Between March and November of 2015, Lamartiniere prescribed Henson Adderall and two pain medications: oxycodone and Opana,[10] and he increased the dosage of the pain medications over time. During this time period, Henson testified that Lamartiniere would conduct random drug screens, but that he did not recall Lamartiniere's ever discussing the results of his tests with him. However, Lamartiniere's patient files show that Henson's July 7, 2015, drug test was positive for methadone, morphine, and marijuana. Despite the positive test, Lamartiniere wrote Henson a

_____

[9] Boudreaux did not appear at trial, and instead the jury was read his testimony from the prior bench trial in this case.

[10] Opana is a "formation" of oxymorphone, and oxymorphone in turn is a "breakdown product" of oxycodone. Oxymorphone is twice as strong as oxycodone.

prescription for Opana on July 24, 2015, and increased the quantity of pills prescribed. Henson admitted that he was addicted to pain medication before he began seeing Lamartiniere and that only after his final appointment with Lamartiniere did he enter a rehabilitation program. On cross-examination, however, Henson agreed that Lamartiniere was "one of the hardest pain doctors . . . to obtain narcotic medications."

Boudreaux, another former patient, testified that he began seeing Lamartiniere in March of 2015 for pain management after he was in a car accident. Boudreaux testified that Lamartiniere would drug test him occasionally at first. After Boudreaux tested positive for heroin and tested negative for his prescribed medications, Lamartiniere switched to testing him at each appointment. Following the positive test, Lamartiniere agreed to continue prescribing Boudreaux oxycodone and Adderall, but instead of writing him a thirty-day prescription, as he usually did, Lamartiniere gave him only a seven-day prescription. Seven days later, however, Lamartiniere returned to writing Boudreaux thirty-day prescriptions. After Boudreaux stopped seeing Lamartiniere, he was arrested for distribution of oxycodone.

Dr. Cecilia Mouton, the former Director of Investigations for the Medical Board, also testified for the Government. She testified that in early 2015, the Medical Board opened an investigation into Lamartiniere after receiving complaints about his "manner of prescribing controlled substances," including a complaint from a pharmacist who was uncomfortable filling Lamartiniere's prescriptions. Based on the investigation, on November 24, 2015, the Medical Board issued an emergency partial suspension of Lamartiniere's medical license which prohibited him from prescribing controlled substances. The Medical Board's suspension letter stated that it had information indicating that Lamartiniere was "prescribing controlled substances without appropriate medical justification or in a manner without concern for patient safety." It

further stated that the Medical Board was "persuaded that Dr. Lamartiniere's continued ability to prescribe controlled substances to his patients could constitute a risk of imminent patient harm." The partial suspension of Lamartiniere's state license did not rescind his DEA certification to prescribe controlled substances.[11]

Dr. Mouton testified that in early December of 2015, she met with Lamartiniere and his legal counsel. During that meeting, Lamartiniere asked for a thirty-day delay of the Medical Board's suspension, which had taken effect on November 24. Although Dr. Mouton agreed to recommend a delay to the Medical Board, she told Lamartiniere she did not have the authority to make that agreement herself. The Medical Board ultimately adopted Dr. Mouton's recommendation and sent Lamartiniere a notice with an updated suspension date of December 30, 2015. According to a delivery receipt, Lamartiniere signed for a package containing the notice on January 4, 2016.

The Government additionally called Dr. Gene Kennedy as an expert in prescribing controlled substances in a family practice and pain management setting. Before testifying, Dr. Kennedy reviewed eighteen patient charts and PMP reports, "a few" drug screens, and the videos and transcripts from the undercover agents' appointments. Based on his review, Dr. Kennedy testified in detail about the deficiencies he found in Lamartiniere's patient charts, emphasizing Lamartiniere's lack of documentation regarding physical examinations and prior medical records. Dr. Kennedy also expressed concern that Lamartiniere did not repeatedly

---

[11] The Government provided testimony from a DEA investigator about the DEA's registration process for practitioners. The investigator explained that "[a]nyone who handles controlled substances must be registered with the DEA," and that in order to obtain such a registration, the practitioner must also "have appropriate licensure from [their] state."

drug test his patients. He additionally opined that some of Lamartiniere's prescriptions lacked an adequate diagnostic basis. For example, Dr. Kennedy testified that Lamartiniere's diagnosis of Dixon with "disorder of the lower extremity" was "so vague as to be essentially a useless diagnosis." He also stated that Lamartiniere prescribed Dixon Adderall for an established "illegitimate purpose" and without a diagnosis of ADD.

Throughout his testimony, Dr. Kennedy emphasized that Lamartiniere's response to obvious signs of drug abuse in his patients fell outside the standard of care. For instance, Dr. Kennedy testified that it was concerning that after Boudreaux tested positive for heroin, Lamartiniere's only response was to limit his prescriptions for a week. This lack of monitoring was especially concerning given that Boudreaux's PMP report showed that he was receiving controlled substances from seven physicians and filling those prescriptions at eleven different pharmacies, which Dr. Kennedy characterized as "alarming . . . doctor shopping as well as pharmacy shopping." Additionally, Dr. Kennedy testified that Henson's positive test for methadone[12] was particularly concerning because methadone's potential to interact with controlled substances could be "perilous." However, shortly after receiving Henson's positive test, Lamartiniere increased his quantity of Opana, a controlled substance.

Dr. Kennedy also discussed Lamartiniere's prescriptions to Jeremy Doiron, a former patient who did not testify at trial. Dr. Kennedy testified that Lamartiniere prescribed Doiron methadone and oxycodone pills in "alarming" quantities over a two-week period in August 2015. Lamartiniere's chart on Doiron noted that he was in a motor vehicle accident and that an emergency room physician diagnosed him with drug abuse. Of

_____

[12] Methadone is another Schedule II controlled substance.

particular note to Dr. Kennedy was that although Lamartiniere acknowledged this diagnosis, he proceeded to increase Doiron's dosage of methadone following the accident. In fact, eight days after Lamartiniere wrote Doiron a prescription for methadone and oxycodone, he wrote Doiron a second prescription for the same medications as a "replacement supply" because Doiron's medication was "destroyed when [his] vehicle caught fire."

On cross-examination, Dr. Kennedy agreed with Lamartiniere's counsel that it appeared Lamartiniere had a hard time saying "no" to persistent patients and was overly trusting of his patients. He clarified later in his testimony that the fact Lamartiniere was struggling to say no to his patients was an indication that he was running afoul of the pertinent regulations because "if there is a struggle, then he [Lamartiniere] recognizes that he's considering something that is wrong." Ultimately, Dr. Kennedy opined that based on patient information he reviewed, each of the charged prescriptions in Counts 8 through 9 and 12 through 30 were outside the normal course of professional practice and did not serve a legitimate medical purpose.

Dr. Kennedy additionally testified about the prescriptions Lamartiniere wrote after he received notice on January 4, 2016, of the partial suspension of his state license. He testified that under 21 C.F.R. § 1306.03, a physician must have two things before prescribing controlled substances: (1) a state registration without any restrictions and (2) a valid DEA registration. In light of the partial suspension of Lamartiniere's state license, and based on his review of the patient charts, Dr. Kennedy opined that the prescriptions Lamartiniere wrote on January 5, 2016, were not within the usual course of medical practice and were not for a legitimate medical purpose.

After the Government rested its case, Lamartiniere moved for judgment of acquittal under Federal Rule of Criminal Procedure 29(a), which the district court denied.

Lamartiniere then testified in his own defense. The thrust of his testimony was that each of his chronic pain patients had "legitimate medical conditions" that he was genuinely trying to treat. Even as to the undercover agents, Lamartiniere testified that at the time he wrote their prescriptions, he believed they were in legitimate pain and that the prescriptions were for legitimate medical purposes. He emphasized that he monitored his patients, including his former patients who testified at trial, for signs of addiction or abuse by conducting drug screens, checking the PMP for evidence of doctor shopping, and following-up if patients were going through their medication too quickly.

Lamartiniere also discussed the partial suspension of his state license. He testified that following his meeting with Dr. Mouton, he was under the impression that they had an agreement to delay his suspension that the Medical Board would "almost certainly" agree to. Lamartiniere's understanding of that agreement was that his partial suspension would be delayed until he could "properly discharge" his patients. Lamartiniere testified that he received a letter from the Medical Board on January 4, 2016, stating that his license would be partially suspended as of December 30, 2015. Despite receiving the letter, Lamartiniere testified that he continued to write prescriptions to his patients on January 5, 2016, because he believed he could do so based on his tentative agreement with Dr. Mouton.

## C.

At the close of all the evidence, Lamartiniere renewed his motion for a judgment of acquittal, which the district court denied. The jury convicted

Lamartiniere of twenty counts of unlawful distribution under § 841(a)(1) and acquitted him on the remaining eight counts.[13]

Lamartiniere filed a post-trial brief requesting a new trial under Rule 33 and renewing his motion for acquittal pursuant to Rule 29(c). In a written decision, the district court denied both motions. The court rejected Lamartiniere's challenges to the jury instructions, concluding that the instructions had properly defined § 841(a)(1)'s authorization element and that the court's deliberate ignorance instruction was supported by the evidence. The court additionally held that "[a]pplying the correct view of 'authorization,' Defendant's challenge to the sufficiency of the evidence falls flat." Lamartiniere filed a motion for reconsideration based on new Tenth Circuit authority, *United States v. Kahn* (*Kahn II*),[14] which the district court denied. The district court sentenced Lamartiniere to 180 months, per count, to run concurrently. Lamartiniere timely appealed.

## II.

We start with Lamartiniere's various challenges to the district court's jury instructions. "We review jury instructions for abuse of discretion if the alleged error is preserved below."[15] However, when "a jury instruction hinges on a question of statutory construction, this court's review is *de novo*."[16] In reviewing jury instructions, "[w]e consider whether the jury

---

[13] Specifically, the jury convicted Lamartiniere on all counts pertaining to his post-license suspension prescriptions and his prescriptions for Doiron, and it acquitted him on all counts pertaining to Aughey. As to Lamartiniere's prescriptions for Henson, Dixon, Boudreaux, and Crawford, the jury convicted him on all but four counts, which corresponded to prescriptions written during each person's initial visit with Lamartiniere.

[14] 58 F.4th 1308 (10th Cir. 2023).

[15] *United States v. Fuchs*, 467 F.3d 889, 900 (5th Cir. 2006).

[16] *United States v. Garcia-Gonzalez*, 714 F.3d 306, 312 (5th Cir. 2013) (internal quotation marks and citation omitted); *see also United States v. Ferris*, 52 F.4th 235, 239 (5th

instruction, taken as a whole, 'is a correct statement of the law and whether it clearly instructs jurors as to the principles of the law applicable to the factual issues confronting them.'"[17] Any error in a jury instruction is subject to harmless-error review.[18]

Jury instructions that were not timely objected to are reviewed for plain error.[19] "[W]e have discretion to reverse a forfeited error only if 'there is (1) error, (2) that is plain, and (3) that affects substantial rights.'"[20] If these three elements are met, "we may only exercise this discretion if '(4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.'"[21]

On appeal, Lamartiniere argues the district court erred in instructing the jury on § 841(a)(1)'s authorization and *mens rea* elements. He further challenges the court's instruction regarding the state-licensing requirement to prescribe controlled substances. Finally, Lamartiniere asserts that the district court erred in instructing the jury on deliberate ignorance. We first set forth the district court's jury instructions and then review each of Lamartiniere's challenges in turn.

---

Cir. 2022) ("[W]hen the instruction is claimed to misstate an element of the offense, review is de novo, subject to harmless-error review." (internal quotation marks and citation omitted)), *cert. denied*, 143 S. Ct. 846 (2023).

[17] *United States v. Guidry*, 406 F.3d 314, 321 (5th Cir. 2005) (quoting *United States v. Daniels*, 281 F.3d 168, 183 (5th Cir. 2002)).

[18] *Ferris*, 52 F.4th at 239.

[19] *Fuchs*, 467 F.3d at 900.

[20] *United States v. Ricard*, 922 F.3d 639, 655 (5th Cir. 2019) (quoting *United States v. Martinez-Rodriguez*, 821 F.3d 659, 662 (5th Cir. 2016)).

[21] *Id.* (quoting *Martinez-Rodriguez*, 821 F.3d at 663).

**A.**

The district court instructed the jury that to find Lamartiniere guilty of distributing controlled substances under § 841(a)(1), the Government had to prove beyond a reasonable doubt the following four elements: (1) "that the Defendant dispensed a controlled substance;" (2) "that the Defendant dispensed the controlled substance knowingly or intentionally;" (3) "that the Defendant's dispensation of the charged controlled substance was not authorized;" and (4) "that the Defendant knew he was acting in an unauthorized manner when he dispensed the controlled substance or intended to act in an unauthorized manner."

The district court then provided additional instructions defining the above elements:

> A prescription is authorized if it is issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.
>
> Both prongs are necessary for a prescription to be authorized. One is not sufficient. That is, the prescription must be issued for a legitimate purpose and within the usual course of a practitioner's professional practice.
>
> By contrast, a prescription is unauthorized if the prescription either lacks a legitimate medical purpose or is outside the usual course of professional practice. In other words, knowingly issuing a prescription outside the course of professional practice is a sufficient condition to convict a medical practitioner of unlawful dispensation of a controlled substance. Likewise, knowingly issuing a prescription without a legitimate medical purpose is a sufficient condition to convict a medical practitioner of unlawful dispensation of a controlled substance.
>
> The term "legitimate medical purpose" in the usual course of his medical practice is defined by reference to the

> standard of medical practice generally recognized and accepted
> by the medical profession in the United States.

The district court further instructed jurors that when "considering whether the Defendant issued a prescription for a legitimate medical purpose in the usual course of professional practice, you may consider all of the Defendant's actions and the circumstances surrounding them." The court went on to instruct that:

> Knowingly keeping insufficient medical records alone does not establish the Defendant's guilt of the charges alleged. Likewise, acting outside the standard of care generally required of physicians throughout the United States alone does not establish the Defendant's guilt. However, you may consider . . . evidence of such facts when determining whether the Defendant was acting in an unauthorized manner when he dispensed a controlled substance or intended to act in an unauthorized manner.

The district court also provided the following good-faith instruction: "[a] controlled substance is prescribed by a physician for a legitimate medical purpose in the usual course of medical practice and, therefore, authorized if the controlled substance is prescribed by him in good faith." It defined good faith "in this context" as "an honest effort to prescribe for a patient's condition in accordance with the standards of medical practice generally recognized or accepted in the United States."

The court additionally instructed jurors that a prescription for a controlled substance "may be issued only by an individual medical practitioner who is, one, authorized to prescribe controlled substances by the jurisdiction in which he is licensed to practice his profession; and, two, in possession of a valid registration from the U.S. Drug Enforcement Administration, unless otherwise exempted from that registration requirement." Earlier in the instructions, the court cautioned jurors that

even if they found "that the Defendant violated applicable civil or administrative rules, regulations, or contract terms, that alone would not be a criminal violation. However, civil or administrative rules, regulations, and contract terms may be relevant to determine whether a Defendant acted with criminal intent; that is, knowingly, intentionally, and without authorization."

### B.

Lamartiniere first challenges the district court's instructions defining the third element—authorization—of the § 841(a)(1) charge. The statute underlying Lamartiniere's convictions, 21 U.S.C. § 841(a)(1), makes it unlawful, "*[e]xcept as authorized*[,] . . . for any person knowingly or intentionally . . . to manufacture, distribute, or dispense . . . a controlled substance."[22]    In turn, § 822(b) provides that medical practitioners registered with the Attorney General "are authorized to possess, manufacture, distribute, or dispense" controlled substances "to the extent authorized by their registration and in conformity with the other provisions" of the Controlled Substances Act ("CSA").[23]    In other words, "[s]ection 822(b) defines the scope of authorization under the Act in circular terms."[24] However, an accompanying regulation promulgated by the Attorney General, 21 C.F.R. § 1306.04(a), provides that a prescription is authorized, and therefore outside § 841(a)(1)'s prohibition, if it is "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his

---

[22] 21 U.S.C. § 841(a)(1) (emphasis added).

[23] 21 U.S.C. § 822(b).

[24] *United States v. Moore*, 423 U.S. 122, 140 (1975).

professional practice."[25]    In *Gonzales v. Oregon*,[26] the Supreme Court characterized § 1306.04(a) as "a parroting regulation" because it "just repeats two statutory phrases [from the CSA] and attempts to summarize the others."[27]

Consistent with the relevant regulation, the district court here instructed the jury that "a prescription is unauthorized if the prescription either lacks a legitimate medical purpose or is outside the usual course of professional practice."  Lamartiniere contends that the court's instruction erred by defining authorization based on a federal regulation.  He argues that authorization is correctly defined based solely on whether a prescription serves a legitimate medical purpose, regardless of whether it is outside the course of professional practice.    Consistent with his definition of authorization, Lamartiniere proposed the following limited jury instruction: "[a]s to the third element, [a] defendant acts in an unauthorized manner when he distributes a controlled substance other than for a legitimate medical purpose."  The district court rejected the limited instruction as contrary to established Fifth Circuit precedent and reasoned that the Supreme Court's recent decision in "*Ruan* [*v. United States*] did not address—much less

_____

[25] 21 C.F.R. § 1306.04(a); *see also Ruan v. United States*, 597 U.S. 450, 454 (2022) ("[A]s provided by regulation, a prescription is only authorized when a doctor issues it 'for a legitimate medical purpose . . . acting in the usual course of his professional practice.'" (alteration in original) (quoting 21 C.F.R. § 1306.04(a))).

[26] 546 U.S. 243 (2006).

[27] *See id.* at 257 ("The CSA allows prescription of drugs only if they have a 'currently accepted medical use,' 21 U.S.C. § 812(b); requires a 'medical purpose' for dispensing the least controlled substances of those on the schedules, § 829(c); and, in its reporting provision, defines a 'valid prescription' as one 'issued for a legitimate medical purpose,' § 830(b)(3)(A)(ii) . . . [and] physicians are considered to be acting as practitioners under the statute if they dispense controlled substances 'in the course of professional practice[,]' § 802(21).").

disturb—the Fifth Circuit's two-prong [authorization] test." Because Lamartiniere has preserved his challenge to § 841(a)(1)'s definition of authorization, our review is *de novo*.

As recognized by the district court, Lamartiniere's challenge to the regulatory definition of authorization is foreclosed by this Court's precedent. In *United States v. Armstrong*,[28] this Court affirmed jury instructions that required the Government to prove that a medical practitioner: (1) "prescribed or dispensed the controlled substance alleged in the indictment;" (2) "did so knowingly and intentionally;" and (3) "prescribed or dispensed the controlled substance either without a legitimate medical purpose or outside the course of his or her professional practice."[29] As to the third element, we acknowledged that it was "not expressly required by the text of § 841, but relevant regulations [21 C.F.R. § 1306.04(a)] provide that a controlled substance can be dispensed by a prescription 'issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.'"[30] We further noted that in *Gonzales*, "the Supreme Court determined that § 1306.04 'does little more than restate the terms of the [CSA] itself.'"[31]

*Armstrong* additionally held that "a logical reading of 21 C.F.R. § 1306.04" shows that "[b]oth prongs are necessary for a prescription to be legitimate;" and the "logical converse is that a practitioner is unauthorized to dispense a controlled substance if the prescription *either* lacks a legitimate

---

[28] 550 F.3d 382 (5th Cir. 2008).

[29] *Id.* at 398.

[30] *Id.* at 397 (quoting 21 C.F.R. § 1306.04(a)).

[31] *Id.* at 397 n.26 (quoting *Gonzales*, 546 U.S. at 257).

medical purpose *or* is outside the usual course of professional practice."[32]  In the years following *Armstrong*, this Court has continually affirmed the use § 1306.04(a)'s definition of authorization to define the term under § 841(a)(1).[33]

Most notably, *Armstrong* rejected the definition of authorization that Lamartiniere now seeks to revive, namely that a prescription is unauthorized only if it lacks a legitimate medical purpose.  In rejecting that argument, *Armstrong* held that such a limited interpretation of authorization was inconsistent with "the relevant statutory language, regulation, [*United States v.*] *Moore*, and Fifth Circuit precedent."[34]  In particular, we highlighted that the jury instructions in *Moore* "did not include the requirement that the

---

[32] *Id.* at 397.

[33] *See, e.g.*, *United States v. Bennett*, 874 F.3d 236, 245 (5th Cir. 2017) (recognizing that "relevant regulations provide that a controlled substance can be dispensed by a prescription issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice" (internal quotation marks and citation omitted)); *United States v. Evans*, 892 F.3d 692, 703 (5th Cir. 2018) (requiring the Government to prove that the "charged prescriptions had no legitimate medical purpose or were written outside the course of [defendant's] professional practice" to satisfy § 841(a)(1)'s authorization element); *United States v. Pierre*, 88 F.4th 574, 580 n.7, 582 n.8 (5th Cir. 2023) (identifying § 1306.04(a) as the "relevant regulation" defining authorized prescriptions); *United States v. Little*, Nos. 21-11225 & 21-11228, 2023 WL 7294199, at *9 (5th Cir. Nov. 3, 2023) (per curiam) (unpublished) ("[A] practitioner is unauthorized to dispense a controlled substance if the prescription *either* lacks a legitimate purpose *or* is outside the usual course of professional practice." (alteration in original) (internal quotation marks and citation omitted)).

[34] *Armstrong*, 550 F.3d at 396 & n.25; *see also United States v. Brown*, 553 F.3d 768, 791 n.71 (5th Cir. 2008) (adopting the reasoning of a prior unpublished opinion in which this Court rejected the argument that the Government was "attempt[ing] to impermissibly bootstrap a violation of 21 C.F.R. § 1306.04(a) . . . into a criminal offense [under § 841(a)]" on the grounds "that the regulation was an interpretive regulation, not a civil regulation; the indictment only charged a violation of § 841(a), and physicians can be prosecuted for prescribing drugs outside of professional practice" (quoting *United States v. Ogle*, 201 F. App'x 979, 980 (5th Cir. 2006) (per curiam) (unpublished))).

No. 23-30191

Government prove beyond a reasonable doubt that the physician prescribed the controlled substance other than for a legitimate medical *purpose*."[35] Indeed, contrary to Lamartiniere's treatment of the phrase usual course of professional practice as surplusage, the Supreme Court in *Moore* held that the "scheme of the statute [§ 841], viewed against the background of the legislative history, reveals an intent to limit a registered physician's dispensing authority to the course of his 'professional practice.'"[36] Accordingly, both *Moore* and *Armstrong* are directly at odds with Lamartiniere's proposed definition of authorization.[37]

Under this Court's rule of orderliness, "one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our *en banc* court."[38]  "[F]or a Supreme Court decision to change our Circuit's law, it must be more than merely illuminating with respect to the case before [the court] and must unequivocally overrule prior precedent."[39] Similarly, an "*en banc* decision cannot overturn a binding published panel decision unless it does so clearly."[40]

---

[35] *Armstrong*, 550 F.3d at 399.

[36] *Moore*, 423 U.S. at 140.

[37] *See id.* at 124 (holding "that registered physicians can be prosecuted under § 841 when their activities fall outside the usual course of professional practice"); *Armstrong*, 550 F.3d at 397 ("In other words, knowingly distributing prescriptions outside the course of professional practice is a sufficient condition to convict a defendant under the criminal statutes relating to controlled substances.").

[38] *Jacobs v. Nat'l Drug Intel. Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008).

[39] *Tech. Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 405 (5th Cir. 2012) (second alteration in original) (internal quotation marks and citation omitted).

[40] *United States v. Vega*, 960 F.3d 669, 675 (5th Cir. 2020).

No. 23-30191

Seeking to avoid the conclusion that *Armstrong* controls under the rule of orderliness, Lamartiniere initially attempts to distinguish the jury instructions given in this case from *Armstrong*. He alternatively argues that a combination of the Supreme Court's decision in *Ruan*, the major questions doctrine, and this Court's en banc decision in *Cargill v. Garland*[41] constitute an intervening change in the law that requires us to depart from *Armstrong*. Neither argument is persuasive.

First, the relevant jury instructions in this case are indistinguishable from *Armstrong*. Lamartiniere seeks to distinguish them on the grounds that in *Armstrong*, we acknowledged that "the district court essentially defined conduct 'in the usual course of professional practice' as conduct that is intended 'for a legitimate medical purpose.'"[42] The basis for this statement in *Armstrong* was the district court's instruction regarding good faith, which stated that prescriptions were lawful if they were prescribed by a physician in good faith, and that "*[g]ood faith in this context means an honest effort to prescribe for a patient's condition* in accordance with the standards of medical practice generally recognized or accepted in this country."[43] According to Lamartiniere, the phrases "legitimate medical purpose" and "usual course of professional practice" mean the same thing; consequently, *Armstrong*'s instructions were a correct statement of law. He submits that the instructions given in this case are distinguishable because they emphasize that the phrases mean different things and erroneously provide that either prong is sufficient for a conviction.

---

[41] 57 F.4th 447 (5th Cir. 2023) (en banc), *cert. granted*, 144 S. Ct. 374 (2023).

[42] *Armstrong*, 550 F.3d at 398.

[43] *Id.*

No. 23-30191

The problem with Lamartiniere's argument is that the district court's good-faith instruction in this case is almost identical to the good-faith instruction in *Armstrong*.[44]  Thus, to the extent the good-faith instruction in *Armstrong* treated the two phrases as interchangeable, so too did the good-faith instruction here.  Moreover, like the instructions here, the instructions in *Armstrong* elsewhere made clear that the Government satisfies the authorization element if it proves "either that the physician prescribed or dispensed the drug other than for a legitimate medical purpose or that the physician dispensed the drug not in the usual course of medical practice."[45]  Thus, Lamartiniere's effort to distinguish *Armstrong* is unavailing.

In the alternative, Lamartiniere asserts that *Armstrong* has been overruled by an intervening change in the law.  But despite Lamartiniere's arguments to the contrary, neither *Ruan*, *Cargill*, nor the major questions doctrine overruled *Armstrong* or the Supreme Court cases upon which *Armstrong* relied.

In *Ruan*, the Supreme Court reviewed two cases from the Tenth and Eleventh Circuits consolidated on appeal.  The Supreme Court addressed "the state of mind that the Government must prove to convict . . . doctors of violating [§ 841(a)(1)]."[46]  In resolving this issue, the Court held "that the statute's 'knowingly or intentionally' *mens rea* applies to authorization."[47]

---

[44] In *Armstrong*, the district court instructed the jury that "*Good faith in this context means an honest effort to prescribe for a patient's condition* in accordance with the standards of medical practice generally recognized or accepted in this country." *Id.*  Here, the district court instructed the jury that "'Good faith' in this context means an honest effort to prescribe for a patient's condition in accordance with the standards of medical practice generally recognized or accepted in the United States."

[45] *Id.*

[46] *Ruan*, 597 U.S. at 454.

[47] *Id.*

No. 23-30191

The Court further explained that "[a]fter a defendant produces evidence that he or she was authorized to dispense controlled substances, the Government must prove beyond a reasonable doubt that the defendant knew that he or she was acting in an unauthorized manner, or intended to do so."[48] After setting forth the required *mens rea*, the Court remanded the cases to their respective circuits for determinations in the first instance of whether the jury instructions at issue were consistent with the Court's decision.[49]

As an initial matter, *Ruan* addressed the *mens rea* requirement for a conviction under § 841(a)(1), not the *separate* authorization element. To the extent *Ruan* mentioned the definition of an authorized prescription, it did so with reference to the regulatory definition Lamartiniere challenges here.[50] It is therefore unsurprising that on remand, neither the Tenth nor Eleventh Circuit questioned that the regulatory definition of authorization governed

---

[48] *Id.*

[49] *Id.* at 467.

[50] *See id.* at 454 (noting that "as provided by regulation, a prescription is only authorized when a doctor issues it 'for a legitimate medical purpose . . . acting in the usual course of his professional practice'" (alteration in original) (quoting 21 C.F.R. § 1306.04(a))); *see also id.* at 467 (citing 21 C.F.R. § 1306.04(a) as "the regulation defining the scope of a doctor's prescribing authority"); *id.* at 455 ("We assume, as did the courts below and the parties here, that a prescription is 'authorized' and therefore lawful if it satisfies [§ 1306.04(a)].").

No. 23-30191

the third element of the offense.[51]  And since *Ruan*, both this Court[52] and our sister circuits[53] have rejected similar challenges to § 1306.04(a)'s definition of authorization.  Simply put, *Ruan* did not even question, let alone

---

[51] *See Kahn II*, 58 F.4th at 1319 ("Here, the government is correct that the Supreme Court has acknowledged that 'the scope of a doctor's prescribing authority' remains tethered 'to objective criteria such as legitimate medical purpose and usual course of professional practice'" (quoting *Ruan*, 597 U.S. at 467)); *United States v. Ruan*, 56 F.4th 1291, 1296 (11th Cir. 2023) (*Ruan II*) (per curiam) ("The relevant drugs in this case are only 'authorized' to be dispensed pursuant to a prescription, and an effective prescription must be made for a 'legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.'" (quoting 21 C.F.R. § 1306.04(a))), *cert. denied*, 144 S. Ct. 377 (2023).

[52] *See Pierre*, 88 F.4th at 582 n.8 (rejecting the defendant's argument that "it was error to ask the jury whether he agreed to unlawfully dispense drugs 'outside the scope of professional practice *or* without a legitimate medical purpose,'" because the instruction "correctly conveyed what the regulation provides"); *United States v. Capistrano*, 74 F.4th 756, 771 n.51 (5th Cir. 2023) (same), *cert. denied*, 144 S. Ct. 516 (2023); *see also Little*, 2023 WL 7294199, at *9–10 (rejecting the defendant's preserved challenge to the sufficiency of the evidence about whether the charged prescriptions were outside the usual course of professional practice or lacked a legitimate medical purpose).  Lamartiniere argues that *Pierre* and *Capistrano* are "not binding on this Court" because the Court's authorization discussion was dicta and both cases only reviewed the jury instructions under our plain-error standard of review.  Although both *Pierre* and *Capistrano* were decided under a standard of review different from the one in this case, the relevant statements were not dicta because they were essential to the holdings given that defendants in both cases were challenging the definition of authorization as articulated in the jury instructions.  *See Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 721 (5th Cir. 2004) ("A statement is not dictum if it is necessary to the result or constitutes an explication of the governing rules of law.").

[53] *See, e.g.*, *United States v. Heaton*, 59 F.4th 1226, 1238–40 & 1241 n.17 (11th Cir. 2023) (rejecting a defendant's challenge to jury charges reflecting the regulatory language that a prescription is unauthorized if it is issued "outside the usual course of professional practice" or "for no legitimate medical purpose"); *United States v. Bauer*, 82 F.4th 522, 528 (6th Cir. 2023) ("Registered doctors are among those 'authorized' to prescribe controlled substances but only when the doctor 'issued [the prescription] for a legitimate medical purpose . . . acting in the usual course of his professional practice.'" (alterations in original) (quoting 21 C.F.R. § 1306.04(a))).

"unequivocally overrule" *Armstrong*'s use of the regulatory definition of authorization.

Lamartiniere next contends that because Congress did not authorize the Attorney General to define the scope of authorization, *Armstrong*'s reliance on a regulation (as opposed to the underlying statute) runs afoul of the major questions doctrine and conflicts with *Cargill*'s holding that agency interpretations of criminal statutes are not entitled to deference. But, as recognized by *Armstrong*, the Supreme Court in *Gonzales* made clear that § 1306.04(a)'s definition of authorization "does little more than restate the terms of the [CSA] itself."[54] Lamartiniere does not suggest that *Gonzales* has been overruled, and to the contrary, relies on the case throughout his briefing. Lamartiniere's arguments are therefore foreclosed by the Supreme Court's holding in *Gonzales*.

Under the rule of orderliness, we remain bound to follow established precedent that a prescription is unauthorized under § 841(a)(1) if it lacks a legitimate medical purpose or was issued outside the usual course of professional practice. Because the district court's instructions defining authorization are consistent with this precedent, Lamartiniere's challenge to these instructions lacks merit.

## C.

Lamartiniere next renews his preserved challenge to the district court's state-licensing instruction. The challenged instruction, which is based on 21 C.F.R. § 1306.03(a),[55] informed the jury that in order to prescribe

---

[54] *Armstrong*, 550 F.3d at 397 n.26 (quoting *Gonzales*, 546 U.S. at 257).

[55] "A prescription for a controlled substance may be issued only by an individual practitioner who is: (1) Authorized to prescribe controlled substances by the jurisdiction in

controlled substances, a medical practitioner must be "[1] authorized . . . by the jurisdiction in which he is licensed to practice his profession" and "[2] in possession of a valid registration from the U.S. Drug Enforcement Administration."

Lamartiniere asserts that the challenged instruction permitted the jury to find him strictly liable for prescriptions he wrote after his license to prescribe controlled substances was suspended by the Medical Board based solely on a violation of § 1306.03(a). Specifically, Lamartiniere maintains that the instruction allowed the jury to find that he lacked authorization to issue the charged prescriptions without deciding whether they served a legitimate medical purpose and despite the fact that he had a valid DEA license to distribute controlled substances.

Taken together, the district court's jury instructions cannot be read as giving jurors license to conclude that the prescriptions charged in Counts 1 through 7 were unauthorized solely because they were written after Lamartiniere's state medical license was partially suspended.[56] In addition to the state-licensing instruction, the court instructed the jury that a "prescription is authorized if it is issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." It further instructed jurors that in deciding whether Lamartiniere issued prescriptions for a legitimate medical purpose in the usual course of professional practice, they "may consider all of the Defendant's actions and

---

which he is licensed to practice his profession and (2) Either registered or exempted from registration pursuant to §§ 1301.22(c) and 1301.23 of this chapter." 21 C.F.R. § 1306.03(a).

[56] *See United States v. Phea*, 755 F.3d 255, 266 (5th Cir. 2014) ("[S]pecific jury instructions are to be judged not in isolation, but must be considered in the context of the instructions as a whole and the trial record." (internal quotation marks and citation omitted)).

the circumstances surrounding them." Finally, the court cautioned jurors that even if they found that Lamartiniere "violated applicable civil or administrative rules, regulations, or contract terms, that alone would not be a criminal violation," but that such violations "may be relevant to determine whether [Lamartiniere] acted . . . knowingly, intentionally, and without authorization."

These instructions, read as a whole, did not impermissibly require the jury to convict Lamartiniere simply for prescribing controlled substances with a suspended state license. Instead, the instructions permitted jurors to consider the fact that Lamartiniere issued prescriptions with a suspended state license in violation of § 1306.03(a) as evidence that those prescriptions were not issued for a legitimate medical purpose or in the usual course of professional practice. This Court has upheld the use of regulations for this purpose in both *United States v. Bennett*[57] and *United States v. Brown*.[58] Indeed, as in *Bennett*, the fact that Lamartiniere wrote these prescriptions after his state license was suspended was relevant evidence for the jury to consider in determining whether the prescriptions were outside the scope of his professional practice.[59] Furthermore, the fact that Lamartiniere

_____

[57] In *Bennett*, we rejected the argument that a § 841(a)(1) conviction was based on the defendant's "failure to adhere to medical regulations, rather than the elements of the crimes charged." 874 F.3d at 243. In particular, we held that the Government's reference to relevant regulations was appropriate given that the regulations "helped clarify the scope and contour of 'outside the course of professional practice'—the very purpose for which the trial was being conducted—and thus did not work a due process violation against [the defendant]." *Id.* at 245.

[58] In *Brown*, we similarly rejected the argument that the "prosecution secured a criminal conviction by proving that the [defendant] pharmacists violated the [*Texas Pharmacy Laws and Regulations*]" by acknowledging the "commonplace use of duly issued regulations in clarifying the scope and contour of criminal laws." 553 F.3d at 791.

[59] *See Bennett*, 874 F.3d at 245 (holding that reference to the relevant regulations was appropriate because the regulations "helped clarify the scope and contour of 'outside

maintained his DEA registration at the time is of no moment. The Supreme Court has made clear that a physician is not exempt from prosecution under § 841(a)(1) simply by having a DEA registration.[60] Accordingly, the district court did not err by giving the state-licensing instruction.

## D.

Turning to Lamartiniere's challenges to the district court's *mens rea* instructions, Lamartiniere asserts that both the court's articulation of the *mens rea* element and its instructions defining that element run afoul of the Supreme Court's decision in *Ruan*.

## 1.

In stating the fourth element of a § 841(a)(1) offense—the *mens rea* requirement—the district court instructed the jury that the Government was required to prove "that the Defendant knew he was acting in an unauthorized manner when he dispensed the controlled substance or intended to act in an unauthorized manner." The court issued this instruction instead of Lamartiniere's proposed instruction that the Government was required to prove "the defendant knew or intended that his conduct was unauthorized."

On appeal, Lamartiniere argues that there is an important distinction between knowingly acting in an unauthorized *manner* and knowing that a prescription is unauthorized. Because Lamartiniere did not challenge the

---

the course of professional practice'"); *cf. Moore*, 423 U.S. at 140–41 ("In the case of a physician . . . [the CSA] contemplates that he is authorized by the State to practice medicine and to dispense drugs in connection with his professional practice.").

[60] *See Moore*, 423 U.S. at 131–32 ("We think the statutory language cannot fairly be read to support the view that all activities of registered physicians are exempted from the reach of § 841 simply because of their status.").

No. 23-30191

district court's articulation of the *mens rea* element below,[61] and instead agreed that the instruction's language was "directly from *Ruan*," we review his challenge for plain error.

As Lamartiniere recognized below, the district court's statement of the *mens rea* element comes from *Ruan*. Specifically, *Ruan* held that "the Government must prove beyond a reasonable doubt that the defendant knowingly or intentionally acted in an unauthorized manner."[62] Because there is no meaningful difference between this language in *Ruan* and the district court's articulation of the *mens rea* element, the instruction was not erroneous, plain or otherwise.

**2.**

Lamartiniere further contends that even if the district court's instruction was correct, the way the court went on to define the *mens rea* element was inconsistent with *Ruan*. In particular, he challenges the district court's instruction that "knowingly issuing a prescription outside the course of professional practice is a sufficient condition to convict a medical practitioner of unlawful dispensation of a controlled substance"[63] and "[l]ikewise, knowingly issuing a prescription without a legitimate medical

---

[61] *See United States v. Rosenthal*, 805 F.3d 523, 530 (5th Cir. 2015) (recognizing that the defendant did not preserve his challenges to the jury instructions simply by "proffering jury instructions that were refused").

[62] *Ruan*, 597 U.S. at 457.

[63] To the extent Lamartiniere argues that the *mens rea* element can only be satisfied if the Government shows he knowingly issued prescriptions without a legitimate medical purpose, that argument is foreclosed by *Ruan* which makes clear the Government can compare a defendant's subjective beliefs against objective criteria, including the usual course of professional practice. *Id.* at 467.

purpose is a sufficient condition to convict a medical practitioner of unlawful dispensation of a controlled substance."

According to Lamartiniere, in order to establish the *mens rea* element, a "knowing violation of the standard articulated in CFR § 1306.04(a) is circumstantial evidence that a defendant knew his conduct was outside the scope of his CSA authorization," but pursuant to *Ruan*, it is "not dispositive." Because Lamartiniere preserved his challenge to the definition of the *mens rea* requirement, our review is *de novo*.

In *Ruan*, the Court overruled decisions from the Tenth and Eleventh Circuits that required the Government to prove that a physician "either: (1) subjectively knew a prescription was issued not for a legitimate medical purpose; or (2) issued a prescription that was objectively not in the usual course of professional practice."[64] Specifically, the Court rejected the assertion that the Government could establish a defendant's *mens rea* by proving the defendant did not make an "objectively reasonable attempt to ascertain and act within the bounds of professional medicine."[65] In so holding, the Court provided the following guidance on establishing *mens rea*:

> The Government, of course, can prove knowledge of a lack of authorization through circumstantial evidence. And the regulation defining the scope of a doctor's prescribing authority does so by reference to objective criteria such as "legitimate medical purpose" and "usual course" of "professional practice." As we have said before, "the more unreasonable" a defendant's "asserted beliefs or misunderstandings are," especially as measured against objective criteria, "the more likely

---

[64] *Id.* at 456–57 (quoting *United States v. Kahn*, 989 F.3d 806, 825 (10th Cir. 2021), *vacated and remanded sub nom. Ruan*, 597 U.S. 450); *id.* at 456 (stating the Eleventh Circuit jury instructions).

[65] *Id.* at 465.

the jury . . . will find that the Government has carried its burden of proving knowledge." But the Government must still carry this burden. And for purposes of a criminal conviction under § 841, this requires proving that a defendant knew or intended that his or her conduct was unauthorized.[66]

On remand, the Eleventh Circuit vacated the defendants' convictions under § 841(a)(1) after concluding that "the district court did not adequately instruct the jury that the defendants must have 'knowingly or intentionally' prescribed outside the usual course of their professional practices."[67] In subsequent cases, the Eleventh Circuit has concluded there is "no *Ruan* error" in *mens rea* instructions that require the Government to prove the defendant subjectively knew a controlled substance prescription lacked a legitimate medical purpose or was outside the usual course of professional practice.[68]

In the consolidated case remanded to the Tenth Circuit—*Kahn II*—the court there concluded that the district court's *mens rea* instruction was erroneous under *Ruan* for two reasons.[69] "First, *Ruan* expressly disallows conviction under § 841(a)(1) for behavior that is only objectively

---

[66] *Id.* at 467 (alteration in original) (internal citations omitted).

[67] *Ruan II*, 56 F.4th at 1298.

[68] *See Heaton*, 59 F.4th at 1241–42 & n.16 (rejecting the defendant's challenge to the jury instruction as to the *mens rea* element because the "jury was properly instructed that whether [defendant] prescribed controlled substances for a legitimate medical purpose 'depend[ed] on his subjective belief,'" and although the jury was instructed that the usual course of professional practice inquiry was objective, the error was harmless because "the government presented overwhelming evidence that [defendant] subjectively *knew* his conduct fell outside the usual course of his professional practice"); *see also United States v. Duldulao*, 87 F.4th 1239, 1258 (11th Cir. 2023) (summarizing circuit precedent on § 841(a)(1)'s *mens rea* jury instructions).

[69] *Kahn II*, 58 F.4th at 1315–18.

unauthorized."[70]  Thus, the court's instruction treating the usual course of professional practice inquiry as wholly objective was inconsistent with *Ruan*.[71]  And second, "*Ruan* treats the two criteria in § 1306.04(a) not as distinct bases to support a conviction, but as . . . circumstantial evidence of a defendant's subjective intent to act in an unauthorized manner."[72] Accordingly, the Tenth Circuit held that "because [the instructions] allowed the jury to convict [defendant] after concluding either that [defendant] subjectively knew a prescription was issued not for a legitimate medical purpose, or that he issued a prescription that was objectively not in the usual course of professional practice, . . . [b]oth approaches run counter to *Ruan*."[73] The court underscored that "the government's showing of objective criteria, without proving that a defendant actually intended or knew he or she was acting in an unauthorized way, is not enough to convict."[74]

Lamartiniere emphasizes that *Kahn II* supports his challenge to the *mens rea* jury instructions here because it casts doubt on whether a jury could convict a defendant solely for knowingly violating the criteria in § 1306.04(a). But as Lamartiniere acknowledges, we are not bound by *Kahn II*, and both the Eleventh and Sixth Circuits[75] have affirmed—consistent with the

---

[70] *Id.* at 1316.

[71] *Id.*

[72] *Id.*; *see also id.* at 1319 ("A physician's serial disregard of accepted medical norms constitutes relevant evidence of his mental state . . . .").

[73] *Id.* at 1316.

[74] *Id.* at 1315.

[75] *See United States v. Anderson*, 67 F.4th 755, 766, 769–70 (6th Cir. 2023) (per curiam) (upholding defendant's § 841(a)(1) convictions after finding that a jury could conclude that the defendant "knowingly prescribed controlled substances without a legitimate medical purpose and outside the usual course of professional practice"), *cert. denied*, 144 S. Ct. 552 (2024).

instructions given in this case—that a defendant knowingly acts in an unauthorized manner when he or she prescribes controlled substances knowing they are without a legitimate medical purpose or knowing they are outside the usual course of professional practice. Moreover, this Court, in a plain-error review case post-*Ruan*, held that "a defendant can be convicted *either* for knowing prescriptions were issued for an illegitimate purpose *or* knowing they were dispensed outside the usual course of professional practice."[76]

We find no error in the district court's instructions on the *mens rea* element. Consistent with *Ruan*, the court's instructions made clear from the outset that in order to convict Lamartiniere the jury had to find the Government proved beyond a reasonable doubt that he *knew* he was acting in an unauthorized manner when he dispensed the controlled substances.[77] Maintaining the focus on Lamartiniere's subjective intent, the district court further instructed jurors that "knowingly issuing a prescription outside the course of professional practice is a sufficient condition to convict a medical practitioner" and that "knowingly issuing a prescription without a legitimate medical purpose" is also "a sufficient condition to convict a medical practitioner." Such an instruction is consistent with *Ruan*'s statement that jurors are free to consider the reasonableness of a defendant's beliefs "as measured against objective criteria," such as "legitimate medical purpose" and "usual course" of "professional practice."[78] And because the instructions required jurors to focus on Lamartiniere's subjective intent

---

[76] *Capistrano*, 74 F.4th at 771 n.51.

[77] *See Ruan*, 597 U.S. at 467 ("And for purposes of a criminal conviction under § 841, this requires proving that a defendant knew or intended that his or her conduct was unauthorized.").

[78] *Id.*

under both prongs of § 1306.04(a), they are readily distinguishable from the instructions reviewed in *Ruan* and rejected by our sister circuits on remand.[79]

Moreover, the instructions as a whole conveyed to jurors that to the extent they found Lamartiniere knowingly prescribed controlled substances without a legitimate medical purpose or outside the usual course of professional conduct, they should treat such findings as probative circumstantial evidence that he knew his actions were unauthorized. For example, jurors were instructed that in determining whether Lamartiniere issued prescriptions "for a legitimate medical purpose in the usual course of professional practice," they "may consider all of [his] actions and the circumstances surrounding them." And critically, jurors were also instructed that "[k]nowingly keeping insufficient medical records alone does not establish the Defendant's guilt" and nor do any actions he took "outside the standard of care generally required of physicians." But that they "may consider . . . evidence of such facts when determining whether the Defendant . . . . intended to act in an unauthorized manner."

The above instructions properly focused on Lamartiniere's subjective intent, while also recognizing that under *Ruan*, the jury may consider the reasonableness of Lamartiniere's beliefs as measured against objective

---

[79] *Id*. at 456–57; *see also Kahn II*, 58 F.4th at 1316 (noting that the district court's instructions treated the second prong of § 1306.04(a) "as wholly objective, considering whether a defendant-practitioner objectively acted within that scope [of professional practice], regardless of whether he believed he was doing so" (internal quotation marks and citation omitted)); *Duldulao*, 87 F.4th at 1251 ("Before *Ruan*[], our precedent required the government to show that a defendant subjectively knew he was acting not for a legitimate medical purpose under § 841" but "when it came to whether a physician acted outside the usual course of professional practice, the appropriate focus [was] not on the subjective intent of the doctor but rather on whether, from an objective standpoint, the controlled substances were dispensed in the usual course of professional practice." (internal quotation marks and citation omitted)).

criteria. Accordingly, viewing the instructions as a whole, we find no error under *Ruan*.

**3.**

Third, and finally, Lamartiniere argues that even if the Government could satisfy § 841(a)(1)'s *mens rea* element by showing he wrote prescriptions knowing they were outside the usual course of professional practice, the district court's good-faith instruction did not require the Government to prove as much. The district court instructed jurors that a controlled substance is authorized if it is "prescribed by [a physician] in good faith," which means a physician's "honest effort to prescribe for a patient's condition in accordance with standards of medical practice generally recognized or accepted in the United States."

Lamartiniere objects to the instruction on the grounds that it allowed the jury to convict him based on an objective standard, regardless of whether the jury found that he believed his prescriptions were in accordance with standards of medical practice. He also asserts that the court's good-faith definition was "nearly identical" to the good-faith standard rejected in *Ruan*. Because Lamartiniere raised the objections to the good-faith instruction he presses on appeal for the first time in his motion for a new trial, our review is limited to plain error.[80]

In requiring the Government to prove that a defendant subjectively knew that his prescriptions were unauthorized, the Court in *Ruan* rejected the "substitute *mens rea* standard" offered by the Government, which would

---

[80] *See United States v. Green*, 47 F.4th 279, 289 (5th Cir. 2022) (reviewing a defendant's challenge to jury instructions under plain error because the defendant "did not object to the jury instructions in the district court until his Rule 33 motion for a new trial and thus did not preserve the issue for appeal"), *cert. denied*, 143 S. Ct. 747 (2023).

have read § 841(a)(1) "as implicitly containing an 'objectively reasonable good-faith effort' or 'objective honest-effort standard.'"[81] The Court refused to adopt the Government's standard for two reasons: (1) § 841 does not include words such as "good faith," "objectively," "reasonable," or "honest effort" and (2) the proposed standard "would turn a defendant's criminal liability on the mental state of a hypothetical 'reasonable' doctor, not on the mental state of the defendant himself or herself."[82]

In both jury instructions reviewed in *Ruan*, the district courts included good-faith instructions. In the appeal from the Eleventh Circuit, the district court instructed "the jury that a doctor acts lawfully when he prescribes 'in good faith as part of his medical treatment of a patient in accordance with the standard of medical practice generally recognized and accepted in the United States.'"[83] And in the appeal from the Tenth Circuit, the district court "instructed the jury that it should not convict if it found that [the defendant] acted in 'good faith,' defined as 'an attempt to act in accordance with what a reasonable physician should believe to be proper medical practice.'"[84]

On remand, the Eleventh Circuit explained that the phrase "good faith," absent qualification, "encompasses both subjective and objective good faith," and that in *Ruan*, the Supreme Court "explicitly held [that] only the subjective version is appropriate."[85] The Eleventh Circuit ultimately remanded the case to the district court after concluding that "the remaining jury instructions did not help convey that a subjective analysis was

---

[81] *Ruan*, 597 U.S. at 465.

[82] *Id.*

[83] *Id.* at 455.

[84] *Id.* at 456.

[85] *Ruan II*, 56 F.4th at 1297.

required."[86] On remand in the Tenth Circuit, the court held that the district court's good-faith instruction was "problematic" under *Ruan* by relying "on terms like 'reasonable physician' and 'should believe,'" which "impose an objective standard and are exactly the type of language that the Supreme Court stated is impermissible."[87]

Here, the district court's good-faith instruction is distinguishable in three important ways from the instructions at issue in *Ruan*. First, unlike the Government's proposed *mens rea* standard rejected by the Court, the district court's good-faith instruction did not include phrases such as "objectively reasonable good-faith effort," or "objective honest-effort standard."[88] Second, unlike the instruction from the Tenth Circuit appeal, the instruction here did not use the phrase, "what a reasonable physician should believe," which denotes an objective nature to the good-faith inquiry.

Finally, unlike the instruction from the Eleventh Circuit appeal, the instruction here defined good faith in terms of the defendant's subjective belief by using the phrase "honest effort," and any objective aspect of the instruction was properly qualified in the context of the instructions as a whole.[89] Specifically, the district court's charge that "acting outside the standard of care generally required of physicians throughout the United States alone does not establish the Defendant's guilt," makes clear that any objective aspect of the good-faith instruction is not a basis, by itself, to convict a defendant. Furthermore, the court's instruction that the Government must

---

[86] *Id.*

[87] *Kahn II*, 58 F.4th at 1317.

[88] *Ruan*, 597 U.S. at 465.

[89] *Cf. Ruan II*, 56 F.4th at 1298 ("[T]he summary of the charge also did not help to convey the required mens rea.").

No. 23-30191

prove the defendant's knowledge or intent to act in an unauthorized manner squarely frames the *mens rea* inquiry as a subjective one.  Because the good-faith instruction, read in context of the full jury charge, properly communicated to the jury the appropriate *mens rea* standard, the instruction was not plainly erroneous under *Ruan*.[90]

### E.

Lamartiniere's final claim of jury instruction error is that the district court improperly gave a deliberate ignorance instruction.[91]     Because Lamartiniere preserved this challenge, we review the district court's instruction under an abuse of discretion standard.[92]

This Court has "often cautioned against the use of the deliberate ignorance instruction."[93]  We have repeatedly emphasized that a deliberate ignorance instruction should not be given as "a backup or supplement in a case that hinges on a defendant's actual knowledge," and that the "instruction is appropriate *only* in the circumstances where a defendant 'claims a lack of guilty knowledge and the proof at trial supports an inference

---

[90] *See United States v. Mencia*, No. 18-13967, 2022 WL 17336503, at *14 (11th Cir. Nov. 30, 2022) (per curiam) ("Consistent with the Court's holding in *Ruan*, the good faith instruction in this case required the jury to consider [defendant]'s subjective intent in determining whether he had a 'good faith reasonable belief' that the distribution of controlled substances was unauthorized.").

[91] The district court gave the following instruction on deliberate ignorance: "[y]ou may find that Defendant had knowledge of a fact if you find that the Defendant deliberately closed his eyes to what would otherwise have been obvious to him."  The court further instructed that "[w]hile knowledge on the part of the Defendant cannot be established merely by demonstrating that the Defendant was negligent, careless, or foolish, knowledge can be inferred if the Defendant deliberately blinded himself to the existence of a fact."

[92] *United States v. Lee*, 966 F.3d 310, 324 (5th Cir. 2020).

[93] *United States v. Mendoza-Medina*, 346 F.3d 121, 132 (5th Cir. 2003).

of deliberate indifference.'"[94] To support that inference, the evidence at trial must show: "(1) the defendant was subjectively aware of a high probability of the existence of the illegal conduct; and (2) the defendant purposely contrived to avoid learning of the illegal conduct."[95]

The district court rejected Lamartiniere's challenge to the inclusion of the deliberate ignorance instruction after concluding that the "evidence at trial plainly showed that Defendant ignored multiple obvious signs that his patients were abusing or illegally diverting the prescriptions he wrote for them." The court further explained that "[i]n particular, the undercover recordings of Defendant's interactions with law enforcement agents posing as patients captured numerous statements confirming that Defendant was acutely aware of the illegality of his conduct." Although Lamartiniere disagrees with the district court's characterization of the evidence, he nevertheless contends that the court's reasoning is inconsistent with our precedent that the deliberate ignorance instruction is inappropriate in cases premised on actual knowledge. Moreover, he maintains that the evidence at trial showed he directly confronted facts about illegal activity.

The thrust of the Government's case was that Lamartiniere *knew* he was prescribing controlled substances in an unauthorized manner to patients he *knew* were abusing or diverting the drugs. And although Lamartiniere disputes that he had the requisite knowledge, the evidence presented at trial was to the contrary.

For example, the Government presented evidence that Lamartiniere wrote prescriptions after he knew the Medical Board partially suspended his

_____

[94] *United States v. Kuhrt*, 788 F.3d 403, 417 (5th Cir. 2015) (quoting *United States v. Brooks*, 681 F.3d 678, 701 (5th Cir. 2012)).

[95] *Id.* (quoting *Brooks*, 681 F.3d at 701).

license based on its finding that his "continued ability to prescribe controlled substances to his patients could constitute a risk of imminent patient harm." It also presented evidence that Lamartiniere continued to prescribe Schedule II controlled substances to Dixon, Crawford, Henson, and Boudreaux, even though each of them testified they told Lamartiniere that they had illegally obtained drugs from their friends. Lamartiniere's records also confirm that he knew Boudreaux and Henson both failed drug tests, and that Doiron was diagnosed by another physician as suffering from drug abuse. And Lamartiniere himself testified that he saw the needle tracks on Boudreaux's arms, which he acknowledged was an indication of heroin use.

Moreover, the video and audio recordings from the undercover agents include numerous statements by Lamartiniere confirming that he knew his prescriptions were unauthorized. For example, Lamartiniere told Dixon that prescribing Aleve or Tylenol for him would be "[a] little bit more legal." He later admitted to Dixon that he was doing "neither" of the things necessary to ensure Dixon was not diverting his prescriptions, and that he could have his license taken away for "not doing that kind of stuff." Lamartiniere also told Crawford that his symptoms were "not something . . . [that] any doctor should prescribe a . . . major narcotic [for], and that he had to be "careful" about prescribing him controlled substances "without an MRI or records," because it "doesn't look right." As the Government reiterated in closing arguments, these recorded statements show that Lamartiniere "knew what he was doing was wrong" and "knew that these prescriptions were not legitimate."

Given this evidence (and more) of actual knowledge, it was arguably an error for the district court to give the deliberate ignorance instruction.[96]

---

[96] *See id.* ("The government constructed its case on the premise that Appellants were criminally liable based upon their actual knowledge of the fraud and their efforts to

No. 23-30191

But assuming *arguendo* that the district court did err, we have held that "any such error is harmless where substantial evidence of actual knowledge is presented at trial."[97]  As discussed above, there was ample evidence at trial that Lamartiniere had actual knowledge that his prescriptions were unauthorized.  Accordingly, any error by the district court's inclusion of the deliberate ignorance instruction was harmless.

## III.

Lamartiniere argues there was insufficient evidence to support his convictions.  The standard of review for sufficiency-of-the-evidence challenges "depends on whether the claims were preserved."[98]  "We review claims preserved through a Rule 29 motion de novo, but 'with substantial deference to the jury verdict.'"[99]  Under this standard, we will uphold a jury's verdict as long as "a reasonable trier of fact could conclude . . . the elements of the offense were established beyond a reasonable doubt."[100]  Additionally, in light of the deference given to a jury's factfinding role, we "view[] the evidence in the light most favorable to the verdict and draw[] all reasonable inferences from the evidence to support the verdict."[101]  In short,

---

further the fraud.  Thus, it arguably was error for the district court to give the deliberate ignorance instruction.").

[97] *United States v. St. Junius*, 739 F.3d 193, 204–05 (5th Cir. 2013) (internal quotation marks and citation omitted).

[98] *United States v. Suarez*, 879 F.3d 626, 630 (5th Cir. 2018).

[99] *Id.* (quoting *United States v. Delgado*, 672 F.3d 320, 330–31 (5th Cir. 2012) (en banc)).

[100] *Id.* (alteration in original) (citation omitted).

[101] *United States v. Jimenez-Elvirez*, 862 F.3d 527, 533 (5th Cir. 2017) (citation omitted).

No. 23-30191

"a defendant seeking reversal on the basis of insufficient evidence swims upstream."[102]

However, if a sufficiency-of-the-evidence claim was not preserved, our review is only for plain error.[103]  Under plain-error review, the defendant "must show a clear or obvious legal error that affects his substantial rights and 'seriously affect[s] the fairness, integrity, or public reputation of the judicial proceedings.'"[104]  We have held that relief "under this exacting standard" is appropriate "only if the Government's evidence is *obviously* insufficient and the defendant shows a manifest miscarriage of justice."[105]

Because Lamartiniere filed motions for acquittal challenging the sufficiency of the evidence against him, we review his preserved challenges *de novo*.  But as to his claim raised for the first time on appeal—that the Government did not present sufficient evidence that the pre-license suspension prescriptions were outside the usual course of professional practice under *United States v. Rosen*[106]—our review is limited to plain error.[107]

---

[102] *Capistrano*, 74 F.4th at 766 (internal quotation marks and citation omitted).

[103] *Suarez*, 879 F.3d at 630.

[104] *Id.* (alteration in original) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)).

[105] *Id.* at 631 (internal quotation marks and citations omitted).

[106] 582 F.2d 1032 (5th Cir. 1978).

[107] Lamartiniere disputes that he "waive[d] or forfeit[ed] any of the sufficiency arguments presented in his opening brief," asserting that his motions for acquittal argued that the evidence was insufficient to establish both that the prescriptions were unauthorized and that he knew they were unauthorized.  But Lamartiniere's Rule 29 motions focused on whether the prescriptions lacked a legitimate medical purpose and whether he had the requisite knowledge.  To the extent Lamartiniere challenged that the prescriptions were outside the usual course of professional practice, he only argued that Dr. Kennedy's testimony that his practices fell outside the rules set forth by the Louisiana Medical Board

No. 23-30191

As reflected in the jury instructions, to convict Lamartiniere of the offenses charged under § 841(a)(1), the Government was required to prove that he: (1) dispensed a controlled substance; (2) dispensed the controlled substance knowingly or intentionally; (3) his dispensation of the controlled substance was not authorized; and (4) he knew he was acting in an unauthorized manner when he dispensed the controlled substance or intended to act in an unauthorized manner. Lamartiniere does not dispute that there was sufficient evidence as to the first two elements, thus focusing our attention on whether there was sufficient evidence that the prescriptions were unauthorized, and that he knew they were unauthorized.

### A.

Counts 1 through 7 of the superseding indictment charged Lamartiniere with issuing prescriptions for controlled substances on January 5, 2016, after his state license was partially suspended. As to these convictions, Lamartiniere contends there was insufficient evidence to establish the charged prescriptions lacked a legitimate medical purpose and were therefore unauthorized. Lamartiniere concedes that there was sufficient evidence for the jury to conclude that he received the Medical Board's suspension letter before issuing the prescriptions on January 5, 2016, and that he knew the suspension prohibited him for issuing those

---

was insufficient to prove his conduct fell outside the usual course of professional practice in the United States generally. But his challenge on appeal is centered on whether there is sufficient evidence that the charged prescriptions were outside the usual course of professional practice under the factors identified by this Court in *United States v. Rosen*. Accordingly, Lamartiniere's argument on appeal regarding the sufficiency of evidence about the usual course of professional practice prong is distinct from his sufficiency challenge in district court on this prong. "Where, as here, a defendant asserts *specific grounds* for a specific element of a specific count for a Rule 29 motion, he waives all others for that specific count," and our review of those waived objections is limited to plain error. *United States v. Herrera*, 313 F.3d 882, 884–85 (5th Cir. 2002) (en banc) (per curiam).

prescriptions under Louisiana's medical regulations. But he contends that because he still maintained his DEA registration, the Government did not establish that the prescriptions were unauthorized because it provided no analysis of the relevant patient files, and Dr. Kennedy only provided a "conclusory" opinion that the prescriptions lacked a legitimate medical purpose.

The district court correctly recognized that Lamartiniere's sufficiency arguments "fall flat" under "the correct view of 'authorization.'" In other words, Lamartiniere's argument that there was insufficient evidence that the prescriptions lacked a legitimate medical purpose ignores the fact that the Government can also establish a prescription is unauthorized if it is issued outside the usual course of professional practice. It is undisputed that the Government presented sufficient evidence for a reasonable jury to conclude that writing prescriptions for controlled substances with a suspended state license is outside the usual course of professional practice for a physician. And as Lamartiniere acknowledges, there was sufficient evidence based on his own testimony and Dr. Mouton's testimony that he wrote the prescriptions on January 5, 2016, despite knowing that his state license was partially suspended and that such a suspension prohibited him from prescribing controlled substances. We therefore reject Lamartiniere's sufficiency-of-the-evidence challenge as to his convictions for Counts 1 through 7.

**B.**

Lamartiniere also challenges the sufficiency of the evidence supporting his pre-license suspension convictions (Counts 9, 13 through 16, 18 through 19, and 25 through 30). Lamartiniere first contends that the pre-suspension prescriptions all served a legitimate medical purpose because

they helped his patients who were in pain and there was no evidence that his patients abused their medication. We disagree.

As to the convictions related to the undercover agents, the jury heard testimony and undercover recordings that Lamartiniere did not establish a legitimate pain diagnosis or require any objective evidence of a medical problem before prescribing controlled substances. In both cases, Lamartiniere failed to order diagnostic imaging or require prior medical records, and instead relied on the agents' vague descriptions of their pain. For example, Dixon testified that each time he saw Lamartiniere he switched which leg was the source of his pain. And Dr. Kennedy testified that Lamartiniere's diagnosis of Dixon with "disorder of the lower extremity" was "so vague as to be essentially a useless diagnosis." Additionally, Lamartiniere's assertion that his patients were in real pain cannot be reconciled with his statement in an undercover recording that Crawford was "someone that's not really in a lot of pain," and that his symptoms were "really not something" doctors prescribe "major narcotic[s]" for.

As for the convictions related to Lamartiniere's former patients, the jury heard testimony that each of these patients was abusing drugs, but that Lamartiniere continued to prescribe them controlled substances and did not adequately monitor them.[108] In Boudreaux's case, he tested positive for heroin and negative for the drugs prescribed by Lamartiniere. Henson tested

---

[108] *See Lee*, 966 F.3d at 318 (rejecting the defendants' sufficiency-of-the-evidence challenge to their convictions of conspiring to distribute controlled substances where evidence showed they continued to prescribe controlled substances to their patients after they "either test[ed] positive for illegal drugs or test[ed] negative for the drugs [the defendants] had prescribed them"); *Anderson*, 67 F.4th at 769 (holding that the evidence at trial was sufficient to support a conviction under § 841(a)(1) where the "jury heard testimony from two of [defendant's] former patients who testified that they either showed signs of or admitted to addiction when they came to [defendant] asking for pain medications").

positive for methadone, which Dr. Kennedy testified was especially dangerous because of the potential interactions between methadone and high doses of controlled substances.  Finally, Doiron was diagnosed with drug abuse while under Lamartiniere's care, but instead of referring him to substance abuse treatment or tapering his medication, Lamartiniere continued to prescribe him controlled substances in what Dr. Kennedy described as "alarming" quantities.  Although Lamartiniere testified that he monitored his patients for signs of addiction or abuse by conducting drug screens and checking the PMP for evidence of doctor shopping, the Government presented evidence to the contrary.  For example, Dr. Kennedy testified that there was no record of Lamartiniere's ever drug testing Doiron, and Boudreaux's PMP report obviously showed he was both doctor and pharmacy shopping.

Moreover, Dr. Kennedy testified in no uncertain terms that each of the charged prescriptions did not serve a legitimate medical purpose.  Dr. Kennedy's conclusion is consistent with Dr. Mouton's testimony and the Medical Board's letter to Lamartiniere informing him that it had information he was "prescribing controlled substances without appropriate medical justification or in a manner without concern for patient safety."  Viewing the evidence in the light most favorable to the verdict, we conclude the Government presented sufficient evidence that each of Lamartiniere's pre-suspension prescriptions did not serve a legitimate medical purpose.

In the alternative, Lamartiniere, for the first time on appeal, contends that even if the Government could show a prescription was unauthorized if it was outside the course of professional practice, the Government failed to present sufficient evidence to do so.  In support of this argument,

No. 23-30191

Lamartiniere cites the factors this Court identified in *Rosen*[109] as associated with unauthorized prescriptions and contends that "the evidence at trial negated most, if not all" of the factors.  As noted above, we review this sufficiency-of-the-evidence challenge for plain error.

First, the *Rosen* factors are not an exclusive list of circumstances in which prescriptions are unauthorized, and instead are simply "recurring . . . examples" of "condemned behavior" that this Court "glean[ed] from reported cases."[110]  Second, the testimony, viewed in the light most favorable to the verdict, supports a finding that many of the factors identified in *Rosen* are present here, such as evidence of limited physical examinations,[111] early prescription refills,[112] the use of street slang by Lamartiniere's patients,[113] and

---

[109] Those factors include: (1) an "inordinately large quantity of controlled substances was prescribed;" (2) "[l]arge numbers of prescriptions were issued;" (3) "[n]o physical examination was given;" (4) the "physician warned the patient to fill prescriptions at different drug stores;" (5) the "physician issued prescriptions to a patient known to be delivering the drugs to others;" (6) the "physician prescribed controlled drugs at intervals inconsistent with legitimate medical treatment;" (7) the "physician involved used street slang rather than medical terminology for the drugs prescribed;" (8) "[t]here was no logical relationship between the drugs prescribed and treatment of the condition allegedly existing;" and (9) the "physician wrote more than one prescription on occasions in order to spread them out." *Rosen*, 582 F.2d at 1036.

[110] *Id.* at 1035–36.

[111] Although the jury heard conflicting testimony about whether Lamartiniere conducted physical exams during *initial* visits, the testimony was undisputed that he either did not conduct exams on subsequent appointments or conducted only cursory ones.

[112] There was testimony at trial that Lamartiniere refilled both Crawford's and Doiron's prescriptions early based on unverified claims that their prescriptions had been stolen or destroyed.  And Lamartiniere renewed Dixon's Norco prescription just ten days after he wrote his initial prescription which was estimated to last Dixon a couple of months.

[113] Both Crawford and Dixon used street slang to describe drugs, such as "roxies" for Roxicodone and "addies" for Adderall.

testimony that there was no logical connection between the prescriptions Lamartiniere wrote and the alleged medical conditions he was treating.[114]

And third, irrespective of the *Rosen* factors, the Government's evidence that the prescriptions corresponding to Lamartiniere's convictions were outside the usual course of professional practice was not "*obviously* insufficient."[115] Dr. Kennedy testified that based on his review of the patient records, Lamartiniere issued the prescriptions outside the usual course of professional practice in part because he failed to conduct physical examinations (or at least to document such examinations), review past medical records, or require frequent drug tests. Additionally, Lamartiniere's practice of continuing to write prescriptions for his patients despite clear signs of addiction and abuse is at odds with what Dr. Mouton testified was the standard of care, which requires physicians to refer their patients to substance abuse treatment and to taper their medications.[116]

From the above sampling of the evidence alone, a jury could reasonably infer that Lamartiniere issued the pre-suspension prescriptions without a legitimate medical purpose or outside the usual course of professional practice, and thus the prescriptions were unauthorized.

---

[114] As an example, in an undercover recording, Lamartiniere tells Dixon that his use of Adderall to stay awake was a "non-indication" of ADD, but ultimately agrees to write him a prescription. Dr. Kennedy testified that Lamartiniere's prescription for Adderall was for an "illegitimate purpose."

[115] *Suarez*, 879 F.3d at 631 (internal quotation marks and citation omitted).

[116] *See Moore*, 423 U.S. at 127, 142–43 ("The evidence presented at trial was sufficient for the jury to find that respondent's conduct exceeded the bounds of 'professional practice,'" given that the respondent failed to keep accurate records, "gave inadequate physical examinations or none at all[,] . . . ignored the results of the tests he did make[,] . . . and took no precautions against [drug] misuse and diversion.").

No. 23-30191

Lamartiniere also argues that that there was insufficient evidence to satisfy the *mens rea* element as to the pre-suspension convictions. Without providing any authority, Lamartiniere lists two "factors" that he deems to be particularly relevant in determining *mens rea*: "(1) Did the doctor engage in medical decision making and (2) did the doctor organize his practice in a manner designed to exploit or profit from the addiction and dependency of his patients."

The first "factor" Lamartiniere identifies appears to be another way of asking whether a doctor knowingly prescribed controlled substances without a legitimate medical purpose. According to Lamartiniere, the evidence presented at trial that he was "struggling" to find the medically correct treatment shows that he was engaged in legitimate medical decision making. But the jury could instead view Lamartiniere's struggle to say "no" to his patients as Dr. Kennedy testified—an indication that Lamartiniere knew he was "considering something that is wrong." Additionally, as recounted in the discussion on the deliberate ignorance instruction, the Government presented extensive evidence that Lamartiniere knew his prescriptions were not for a legitimate medical purpose.[117]

As to the second "factor" identified by Lamartiniere, he asserts that his practice and fee structure undercut any finding that he knowingly wrote unauthorized prescriptions. Lamartiniere highlights that he did not charge patients on a per-prescription basis and that one patient, Henson, testified at trial that Lamartiniere was "one of the hardest pain doctors . . . to obtain

---

[117] *See Lee*, 966 F.3d at 318–19 (rejecting the defendants' sufficiency-of-the-evidence challenges to their convictions for conspiring to distribute controlled substances in part because of evidence that for "at least some of the[] prescriptions" defendants "had direct knowledge that the patients exhibited obvious drug-seeking behavior" but nonetheless continued to prescribe drugs).

narcotic medications" from.  But Lamartiniere's focus on these two pieces of evidence, to the exclusion of extensive contrary evidence presented by the Government, is inconsistent with the standard of review in this case, which requires us to view the evidence in the light most favorable to the verdict.[118]

Even as it relates to the two pieces of evidence highlighted by Lamartiniere, his arguments fall flat.  For instance, even though Lamartiniere did not require payment for each prescription he wrote, that by itself is not inconsistent with the jury's finding that he knowingly wrote unauthorized prescriptions.[119]  In fact, the Government presented evidence that raised red flags about the financial structure of Lamartiniere's practice, such as the fact he did not accept insurance or Medicaid.[120]  Similarly, although Henson testified it was difficult to get controlled substances from Lamartiniere, that is inconsistent with the fact that two undercover agents with vague allegations of prior injuries, no medical records, no previous diagnoses, and admissions of prior illegal drug use, were able to get prescriptions from Lamartiniere for progressively more potent controlled substances.[121]  Accordingly, viewed in the light most favorable to the verdict, there was sufficient evidence that Lamartiniere had the requisite *mens rea*.

---

[118] *See United States v. Cabello*, 33 F.4th 281, 288 (5th Cir. 2022) (noting that we place "a heavy thumb on the scale in favor of the verdict" in reviewing preserved sufficiency-of-the-evidence challenges).

[119] *See Bauer*, 82 F.4th at 529 (finding "ample circumstantial evidence from which a jury could infer that [defendant] did have the required subjective knowledge of unauthorized distribution" despite the defendant's argument that "he lacked any financial incentive to overprescribe opioids").

[120] *See Lee*, 966 F.3d at 317–18 (emphasizing that patients at defendants' clinic "could not use insurance for their first visit, and they could never use Medicaid" was a hallmark of medical practices that serve as a front for dealing prescription drugs).

[121] *See United States v. Moreno-Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011) ("[A]ny conflict in the evidence must be resolved in favor of the jury's verdict.").

No. 23-30191

In sum, the evidence presented at trial was sufficient to support Lamartiniere's convictions under § 841(a)(1) as to the pre-suspension prescriptions.

## IV.

For the foregoing reasons, we AFFIRM Lamartiniere's convictions under § 841(a)(1).